IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------X
:
ESHEREF DEMAJ,                : Civ. No. 3:09 CV 255 (JGM)
Petitioner                    :
:
V.                            :
:
FRIDA SAKAJ,                  : DATE: SEPTEMBER 4, 2012
Respondent                    :
:
------------------------------------------------X

RULING ON RESPONDENT'S MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATING TO "PARENTAL ALIENATION" (Dkt. #155)

      The convoluted procedural history behind this highly acrimonious litigation is set forth in considerable detail in this Magistrate Judge's electronic endorsement, filed August 22, 2012 (Dkt. #141) and Ruling on Petitioner's Letter, Dated 8/28/12, With Respect to Dr. Benjamin Garber and On Respondent's Motion in Limine to Exclude Proposed Testimony of Dr. Garber, filed August 29, 2012 ["August 29 Ruling"](Dkt. #152), familiarity with which is presumed.

      In this pending motion, Respondent moves to exclude any testimony or other evidence relating to "parental alienation syndrome," in that "[d]isclosures by . . . Petitioner as to the testimony expected from Dr. Benjamin Garber indicate that he will testify about the concept of parental alienation syndrome."  (Dkt. #155, at 1).   Respondent contends that within the four paragraphs mentioned by the Magistrate Judge in the August 29 Ruling "is the introduction [of] parental alienation syndrome."  (Dkt. #155, Brief at 2).

      Nothing in the August 29 Ruling has permitted, or will permit, Petitioner to introduce any testimony regarding "parental alienation syndrome."  The terminology does not appear, at all, in Dr. Mantell's thirty-seven page expert report, dated March 22, 2010.  "Parental

alienation" is discussed fleetingly in Dr. Garber's eighteen-page expert report, dated February 1, 2012, but not at all in the August 29 Ruling.  The August 29 Ruling referred to only four paragraphs in Dr. Garber's report that addressed potential coaching, or scripting, by Respondents.  (At 4).  Among those paragraphs was ¶ 5(e) of Section IV.B. on page 7, which criticized Dr. Mantell for his "[f]ailure to evaluate competing hypotheses, e.g., that [Respondent] had scripted or otherwise prompted the children to accuse their father of abuse, as discussed below."  Within Section IV.F., on pages 16-17, entitled "Consideration of Competing Hypotheses," Dr. Garber addressed in ¶ 1 the "possibility" that the children's "presentations were prompted, scripted, or otherwise manipulated by others, including and especially their mother[,]" addressed in ¶ 2 the issue of parental alienation, and addressed in ¶ 3 the degree of alienation.  (See Dkt. #151, at 2; Dkt. #155, Brief, at 2).  However, the August 29 Ruling did not include parental alienation in "the very tailored and limited issue" of potential coaching by Respondent.  (At 6-7).

In a role reversal, during his testimony on February 16, 2012, Respondent's counsel attempted to question Dr. Mantell about parental alienation, to which Petitioner's counsel objected:

> Q. Could you tell us what parental alienation is and whether it's relevant to this family?
>
> MR. REGAN: Your Honor, I'm going to object to the question as being in anticipation of testimony not yet in the record.
>
> Your Honor will recall we had a lengthy and spirited telephone conference last night on the subject of Dr. Mantell essentially seeking to rehab his testimony before it's ever been subject to cross examination or to any expert by [Petitioner].
>
> The words parental alienation are missing from the report, which is Exhibit A.  Never do those words appear [in] Exhibit A.  And it is inappropriate at this time to ask Dr. Mantell to opine about issues which he did not address

in his report on which he has not been disclosed and at which at this point there's nothing in the evidence to suggest that he needs to rehabilitate himself in any way.

    MS. WHITNEY: I think it would be helpful to the Court, your Honor, to have his opinion of this concept.

    MR. REGAN: I was simply going to say, your Honor. It might be helpful for the Court if the Court had an expert designated to come and speak on the issue of parental alienation. There very well may be one of those coming tomorrow from our end of the table, your Honor.

    However, [Respondent] has not designated an expert to speak on that subject. [She] [h]ad the ability to do so, could have done so, [but she] did not. So attempting to shoehorn testimony in through someone who is not disclosed to talk about that subject is inappropriate.

    MS. WHITNEY: Perhaps it would helpful, your Honor, if you asked Dr. Mantell, if, in fact, he would be qualified to talk about this concept.

    MR. REGAN: Your Honor, my response to that would be whether or not he is in fact qualified to testify about [that subject] is not relevant. This is the same issue we faced yesterday when we were discussing some exhibits that were added in at the last minute and whether or not he'd be qualified to talk about those things.

    The point is we have not been put on notice that Dr. Mantell would talk about these subjects. We have not had the opportunity to depose him on the subject of parental alienation, what he did, what he did not do. He has not been disclosed as an expert on parental alienation. So whether or not Dr. Mantell believes he today is an expert on that is not relevant, and he has not been disclosed. So, we'd object to any questions along those lines.

(Dkt. #153, at 74-76).

The Magistrate Judge then ruled as follows:

    THE COURT: The witness had testified before as to the steps he takes to make sure that one parent does not coach the children's responses, either telling them to speak about a topic or avoiding a topic.

    I'll allow the witness to testify as to whether he had an sense that the children had been coached one way or the other by either parent and their responses to them.

BY MS. WHITNEY:

> Q. Dr. Mantell, I think the question is whether the children had been coached by either parent one way or the other.
>
> THE COURT: Was it your impression that they had been coached one way or the other?
>
> A. My impression is yes the children reported to me that they had been coached.
>
> Q. And what did they report to you?
>
> A. They reported to me that they had been coached by their father not to tell the judge or to tell me that he had hit them.
>
> Q. Do you remember which of the children said that?
>
> A. Both children did.
>
> Q. By both you mean both the girls?
>
> A. Yes, both girls did.  And there is an example of K.D. telling me that her mother told her to tell me something, but that would not constitute, in my judgment, an example of coaching.  That was that K.D. made a report to her mother about something that had happened with the father.  And K.D. said when she told her mother about it, her mother said to her to tell the doctor.
>
> Q. Is that contained in your report?
>
> A. Yes, that's in my report.
>
> Q. Do you recall –
>
> A. All of these are.  These are, in fact, all examples of parental influence in which a parent is telling the children to say something to the doctor or not to say something to the doctor.  In the case of the mother, it's the mother directing the child to repeat a just given report to the doctor.  In the case of the father, it's the children, the girls reporting the father telling them not to make such reports.  And also, in [A.D.]'s case, with A.D. reporting her father thanking her for saving him by not telling the doctor in Italy that he had hit her on the head, but only to have said that he hit her on her backside.

(Id. at 76-78).

Moreover, in the volumes of published decisions under ICARA and the Hague

Convention, there is not one published decision that relied to any degree on the "parental alienation syndrome." In Karkkainen v. Kovalchuk, 445 F.2d 280, 288 (3d Cir. 2006), the petitioner-mother argued on appeal that the district court had abused its discretion by appointing an expert to evaluate the daughter's "level of maturity [who] lacked sufficient experience in 'parental alienation syndrome.'" The petitioner-mother contended that her daughter's desires to remain permanently in the United States were the result of the respondent-father and his second wife having alienated the child from the petitioner, including referring to her as the child's aunt. Id. The issue of parental alienation, however, was irrelevant because the district court held that the United States was the child's habitual residence. Id.

Similarly, in Haimdas v. Haimdas, 720 F. Supp. 183, 207, n.17 (E.D.N.Y.), aff'd on other grounds, 401 Fed. Appx. 567 (2d Cir. 2010), the district court categorically rejected the report and testimony of the petitioner-mother's expert regarding the children's maturity level and "any other matter in controversy[,]" giving the report and testimony "no weight." The district judge described the expert's opinions "regarding the potentially distorting effects of the protracted custody battle, parental alienation and ping-pong lifestyle that A.H. and S.H. have experienced, as well as their notable verbal abilities and overall intelligence, essentially confirmed the obvious." Id. The district court observed, "Frankly, short of opining as to a mental or emotional pathology, it is hard to fathom what a [child] psychologist in a Hague Convention case could opine that is not already within the ken of an ordinary finder of fact." Id.

Lastly, in Garcia v. Angarita, 440 F. Supp. 2d 1364,1368 (S.D. Fla. 2006), like here, the court had ordered a psychological evaluation of the child, which report the petitioner-

father introduced into evidence. In this report, the expert opined, in rejecting the respondent-mother's defense of grave risk, that any psychological harm to their son would be reduced by the close relationship the children with his paternal relatives, and the "support system" that the petitioner-father had in Colombia. Id. at 1382. The Court observed that: "Significantly, Respondent is in a position to greatly reduce this risk, if she so chooses, by discontinuing the activities which [the expert] believes have resulted in a degree of parental alienation toward Petitioner, and if Respondent returns with the children to Colombia." Id. The issue of parental alienation was hardly the central focus of that trial.

Thus, under the clear language of the August 29 Ruling, the Magistrate Judge's evidentiary ruling on February 16, 2012, and the published case law under ICARA and the Hague Convention, the issue of "parental alienation syndrome" is not included within "the very tailored and limited issue" on which Dr. Garber may testify. Once again, Dr. Garber's testimony is limited "[s]pecifically, . . . [to] the opinions he expressed in his expert report regarding Dr. Mantell's assessment" with respect to "coaching," and only "coaching." (August 29 Ruling at 6-7).

Accordingly, Respondent's Motion In Limine to Exclude Evidence Relating to "Parental Alienation," filed this morning (Dkt. #155) is denied as moot, as "parental alienation" was not, and will not be, permitted, under the August 29 Ruling.

Dated at New Haven, Connecticut, this 4th day of September, 2012.

/s/ Joan G. Margolis, USMJ  
Joan Glazer Margolis  
United States Magistrate Judge