IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------------X
                                        :
ESHEREF DEMAJ, Petitioner               :              3:09 CV 255 (JGM)
                                        :
V.                                      :
                                        :
FRIDA SAKAJ, Respondent                 :              DATE: MARCH 18, 2013
                                        :
-------------------------------------------------------X
```

MEMORANDUM OF DECISION

On February 11, 2009, Petitioner, Esheref Demaj ["Petitioner" or "Demaj"], commenced this action pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 [the "Hague Convention"], and the International Child Abduction Remedies Act ["ICARA"], petitioning this Court for the immediate return of his three minor children to Italy, and for an immediate issuance of a show cause order to Respondent, Frida Sakaj ["Respondent" or "Sakaj"], who Petitioner claims illegally and wrongfully removed the minor children from Italy on or about September 7, 2007, in violation of Petitioner's custodial rights under Italian law.  (Dkt. #1).  An Order to Show Cause was issued by the late Senior United States District Judge Peter C. Dorsey the next day (Dkt. #5), and the show cause hearing was subsequently rescheduled  five times at the request of counsel.  (Dkts. ##8-9, 11, 13-16, 22-23, 27-28, 31-34, 39-40, 42).[1]  On

---

[1]Specifically, on March 26, 2009, the first extension was sought by Sakaj, along with her Motion to Appoint Counsel and for Psychological Evaluations (Dkt.#13; see Dkt. #15); on February 17, 2010, the second extension was sought with the consent of both parties so that Dr. David Mantell could complete his report (Dkt. #23; see Dkt. #22); on August 4, 2010, the third extension was sought so that Demaj could depose Dr. Mantell (Dkt. #28; see Dkt. #27); on January 28, 2011, the fourth extension was sought because Dr. Mantell's deposition had not yet been taken (Dkt. #32; see Dkt. #31); and on March 30, 2011, the fifth extension was sought on consent of the parties as a status conference was scheduled to be held before Judge Dorsey on April 8, 2011 (Dkt. #39; see Dkts. ##38, 40).  Thereafter, Demaj embarked on taking eleven depositions in Italy, which occurred in November 2011 (Dkts. ##47-48, 50-51).  As discussed below, on January 10,

February 11, 2009, Judge Dorsey appointed Dr. David Mantell to conduct a psychological examination of the three minor children, A.D., K.D., and D.D., at the Court's expense.  (Dkts. ##13-16, 29-30, 35-37, 44-46).[2]  On March 26, 2009, Respondent filed her answer (Dkts. ##12, 17),[3] and on April 21, 2009, Attorney Jennifer E. Davis was appointed as the guardian ad litem for the three minor children.  (Dkt. #20; see Dkt. #18).

In light of Judge Dorsey's unavailability for health reasons, on January 10, 2012, this case was referred to this Magistrate Judge. (Dkt. #52).  Upon Judge Dorsey's death, on February 6, 2012, this case was transferred to United States District Judge Vanessa L. Bryant (Dkt. #73; see Dkts. ##74-76), and the next day, the parties consented to trial before this Magistrate Judge.  (Dkt. #80).  The trial on this matter commenced immediately thereafter, on February 16, 2012, on which date Dr. Mantell testified on direct examination, with limited

---

2012, the case was referred to this Magistrate Judge and the first trial date was held one month later, on February 16, 2012.  (Dkts. ##52, 96).

[2]In Respondent's Motion for Appointment of Counsel, for Psychological Evaluations and for Postponement of Hearing Date, filed on March 26, 2009 (Dkt. #13), in addition to moving to postpone the hearing, Respondent moved the Court for the appointment of an "attorney/guardian ad litem" and to order and fund the psychological evaluation of the three minor children and of the father/Petitioner, to allow Respondent to develop the defenses in Articles 12 and 13 of the Convention, which

> include whether the children have resided in the new home for more than one year and are well-settled there, whether children of sufficient age and maturity to be heard object to their return and whether return would subject the children to grave risk of physical or psychological harm or to an intolerable situation.

(Id. at 1-2).

[3]Although not specifically raised in her answers (Dkts. ##12, 17), Respondent's Motion for Appointment of Counsel, for Psychological Evaluations and for Postponement of Hearing Date, filed March 26, 2009 (Dkt. #13) did assert the three defenses of well-settled, maturity, and grave risk. See note 2 supra.

2

cross examination.  (Dkts. ##64, 69, 72, 96; see Dkts. ##83, 89-91, 93-94).[4]  The next day, by agreement of all counsel (see Dkts. ##57, 72) and with this Court's approval, the minor child A.D. testified in Chambers, on the record, without either parent present, to the questions posed by Attorney Davis, to which counsel agreed.[5]  (Dkt. #101, Sealed Transcript of A.D. Testimony, taken February 17, 2012 ["2/17/12 A.D. Tr."]; see Dkts. ##98-99).[6]

The trial reconvened on March 27, 2012, with the testimony of the children's ESL teacher, Paula Fink, after which the parties requested that the matter be held in abeyance while they pursued settlement discussions.  (Dkts. ##120-21).  On March 29, 2012, counsel placed their status on the record, during which this Magistrate Judge confirmed -- twice -- that counsel would periodically update the Court with their progress. (3/29/12 Tr. at 3-4).[7]

---

[4]See note 6 infra.

[5]On February 13, 2012, Petitioner filed a Motion to Preclude Testimony of the two younger minor children, K.D. and D.D., which was granted, absent objection by Respondent.  (Dkts. ##82, 84, 86).

[6]In light of the schedules of Dr. Mantell (the court-appointed expert), Dr. Benjamin Garber (Petitioner's rebuttal expert), and the other parties involved in this case, the Court, by agreement of counsel, bifurcated Dr. Mantell's direct testimony from the other testimony in this case.  (See Dkt. #72 (February 16-17, 2012 dates set and by further agreement of counsel, the hearing was scheduled to resume on March 27, 2012)); Delvoye v. Lee, 224 F. Supp. 2d 843, 845-46, n.3 & 851, n.12 (D.N.J. 2002)(due to the expert's unavailability, the proceeding was bifurcated), aff'd, 329 F.3d 3300 (3d Cir.), cert. denied, 540 U.S. 967 (2003); see Garcia v. Angarita, 440 F. Supp. 2d 1364, 1374 (S.D. Fla. 2006)(Court granted Petitioner's motion to re-open the case to present testimony from court-appointed expert, and the hearing was continued to a later date when the expert was available to testify).

[7]Counsel represented to the Court on March 29, 2012 that they envisioned that the settlement negotiations would take "hopefully days, perhaps a week or two," not "months and months of time[,]" and certainly not "indefinitely."  (3/29/12 Tr. at 3).

On two occasions, in late April, and in late May, this Magistrate Judge's Chambers contacted counsel for an update on the settlement discussions; counsel responded on both occasions that talks were continuing.  However, the Court notes that in e-mail correspondence between counsel on April 25, 2012, counsel noted their "understanding" that they would be contacting the Court "together to request the resumption of the trial." (Exh. 88). Counsel, however, did not indicate their need to resume trial until a conference call with the Court on

Without having heard from counsel, this Magistrate Judge convened a telephone status conference on June 8, 2012, during which additional trial dates were set in the event that a settlement was not reached.  (Dkts. ## 122-24).  The trial was scheduled to resume on September 5-10, 2012. (Dkt. #124; see Dkts. ##125-26, 133).  At the request of counsel,[8] a telephone conference was held on August 14, 2012, during which the Court was advised for the first time that a settlement had not been reached;[9] the Magistrate Judge inquired if there was a mechanism by which the testimony of Dr. Mantell could be limited, in order to reduce, or eliminate, further expert costs borne by the Court in this case (which have been substantial), in light of concern being expressed by the budget committee for the District. (Dkts. ##127-29, 136; see also 9/7/12 Tr. at 95).  Thereafter, Respondent withdrew the grave risk defense (Dkts. ##132, 140), consistent with which this Court issued an order denying Respondent's Motion in Limine regarding Petitioner's proferred expert witness, Dr. Benjamin Garber, which motion had been filed in January, observing that,

> While there was substantial disagreement between the parties regarding the scope of evidence to be presented at the continued trial, . . . all counsel did agree that the only witnesses who will testify on September 5-10, 2012 will be the two fact witnesses, Respondent Frida Sakaj and [Attorney] Davis[.] [The] one or two expert witnesses, [Dr. Mantell] and [Dr. Garber], will not testify until October 9-12, 2012, as appropriate.

(Dkt. #133)(emphasis added). (See Dkt. #67).[10] This agreement notwithstanding, on August

---

August 14, 2012.

[8]Counsel requested a telephone conference to discuss the remainder of Dr. Mantell's testimony, and whether he would be subpoenaed.

[9]See note 7 supra.

[10]See note 6 supra. Just as in Delvoye, 224 F. Supp. 2d at 846, n.3, the proceeding was "bifurcated and consideration of the expert's report and expert testimony as to risk of psychological harm were stayed pending resolution of the issues that would not require expert testimony."

28, 2012, Petitioner informed the Court of his intent to call Dr. Garber on September 7, 2012, to testify on the issue of coaching.  (Dkt. #149).  This Magistrate Judge held an immediate telephone conference (Dkt. #147), and approximately twenty hours later, after receiving from Petitioner a letter brief in support of his request (Dkt. #150), and Respondent's Motion in Limine to Exclude Dr. Garber's testimony (Dkt. #148; see Dkt. #151), this Magistrate Judge issued a seven page Ruling ["August 2012 Ruling"], granting in part and denying in part both Motions.  (Dkt. #152).   In the August 2012 Ruling, this Magistrate Judge held that:

> Because coaching may be one factor to be considered by the Court in evaluating the "Mature Child" Defense, Petitioner is entitled to have Dr. Garber testify on this single topic in a very limited capacity.  Specifically, Dr. Garber's testimony is limited to the opinions he expressed in his expert report regarding Dr. Mantell's assessment.  Dr. Garber, having never met either the Respondent or the children, is not qualified to testify or opine as to the ultimate issue of whether the children were coached, but rather is limited to his opinions articulated in the four paragraphs of his report in which he addressed potential coaching by Respondent, but only to the extent that issue was overlooked in Dr. Mantell's report.   Identical to the multiple orders entered within the past week, Respondent "should not be left to hear [Dr. Garber's] testimony for the first time when [the expert] takes the witness stand[]" at trial. (August 22 Order). Thus, Respondent, if she wishes, may depose Dr. Garber on September 7, for no more than ninety minutes, on the very tailored and limited issue articulated above, and Dr. Garber will be permitted, on September 10, 2012, to testify only as to his opinions articulated in his report, which opinions were in response to Dr. Mantell's report, again on the very tailored and limited issue articulated above.

(At 6-7).[11]

_____

Similarly, "[o]nly if those issues were not dispositive would the Court then reach the issue of grave risk of psychological harm."  Id.; see id. at 851, n.12 (Petitioner's pending Motion in Limine to exclude the expert's report and testimony was dismissed as moot: "If it were necessary to reach the issue of psychological harm, [the Delvoye] Court would take the testimony of the psychologist and consider appointing its own expert to examine [the father].").

[11]Ultimately, Respondent chose not to depose Dr. Garber (see August 2012 Ruling at 7 & n.6), and Petitioner chose not to call Dr. Garber to testify.  (See Dkt. #179).

The trial resumed on September 5, 2012; Sakaj testified on that date and on September 6, 2012 (see Dkt. #179), and Attorney Davis' direct testimony began on September 6, and continued, with cross examination, on September 7, 2012. (See id. & Exh. U).[12]  On September 5, 2012, Sakaj moved to file an Amended Response to the Verified Petition (Dkt. #161), and the next day, Demaj moved to file an Amended Petition to conform to the evidence of the case (Dkt. #165); both motions were granted (Dkts. ## 160, 163, 166).  On September 11, 2012, Demaj filed his Amended Petition for Return of Minor Children to Italy (Dkt. #171), and Sakaj filed her Answer to the Amended Petition on September 17, 2012, which includes her two Affirmative Defenses of well-settled and mature child.  (Dkt. #175).[13]

On December 14, 2012, both Sakaj and Demaj filed their Post-Trial Briefs. (Dkts. ##189, 191; see also Dkts. ##184-85, 187-88).[14]  On January 4, 2013, Demaj and Sakaj

---

On September 4, 2012, Respondent filed a Motion in Limine to Exclude Evidence Relating to "Parental Alienation[,]" in light of "[d]isclosures by the Petitioner as to testimony expected from Dr. . . . Garber [that] indicate that he will testify about the concept of parental alienation syndrome[,]" which concept "has been discredited, [and] the testimony would be unreliable[.]" (Dkt. #155).  That same day, Respondent's Motion was denied as moot in a six-page ruling, "as 'parental alienation' was not, and will not be, permitted under the August [2012] Ruling[.]" (Dkt. #158, at 6)(emphasis omitted).

[12]Demaj did not appear at trial; his testimony was taken through a videotaped deposition on November 19, 2011.  (Exh. 103).   See also note 53 infra.

[13]After the trial was concluded, on September 19, 2012, this Magistrate Judge filed her Order Sealing Limited Filings Under FED. R. CIV. P. 5.2(a)(3) (Dkt. #176), which placed under seal twenty-six filings made by the parties that included the first names of the three minor children; two amended Orders and an amended Ruling were also filed, which referred to the oldest child, or all three children only by initials.

[14]Copies of case law are attached to Respondent's brief  (Dkt. #189), and to Petitioner's brief.  (Dkt. #191).

Petitioner moved to seal his brief (Dkt. #190), which motion was granted three days later (Dkt. #192), and on January 14, 2013, the unredacted brief was filed under seal.  (Dkt. #198).

filed their reply briefs (Dkts. ##194-95).[15]

## I. FINDINGS OF FACT

The following constitutes the Court's findings of fact, pursuant to FED. R. CIV. P. 52(a)(1):[16]

Esheref Demaj and Frida Sakaj both were born and raised in Albania, and married in February 1996 in Valona, Albania.  (Exh. 1; see Dkts. ##77, 79 ["Jt. Stip. of Fact"] ¶¶ 1,3; Dkt. #171, ¶ 6; Dkt. #175, ¶ 6).   Since their marriage, Demaj and Sakaj maintained a permanent residence and home in common in Maiolati Spontini, Italy, a village of approximately three hundred people.  (Jt. Stip. of Fact ¶ 5; Transcript of Sakaj Testimony, taken September 6, 2012 ["9/6/12 Sakaj Tr."] at 42).  Three minor children were born of this union: a daughter, A.D., in February 1999; another daughter, K.D., in November 2001; and a son, D.D., in October 2003.  (Jt. Stip. of Fact  ¶ 6; Exhs. 2-4).  Although she had graduated from law school in Albania, Sakaj's "primar[y]" job in Italy was raising her children.  (Jt. Stip. of Fact ¶ 4; 9/6/12 Sakaj Tr. at 37, 41-42, 65, 81, 207).  Demaj and the three minor children are all citizens of Italy.  (Jt. Stip. of Fact ¶ 8;Transcript of Sakaj Testimony, taken September 5, 2012 ["9/5/12 Sakaj Tr."] at 59).

Sakaj's parents, brother, and sister, who were citizens of and lived in Albania, all moved to the United States in 2000.  (Jt. Stip. of Fact ¶ 10; 9/5/12 Sakaj Tr. at 52-53; 9/6/12 Sakaj Tr. at 50).  During June 2007, Demaj, A.D., and K.D., visited the United States, staying with Sakaj's parents for two weeks at their home in Simsbury, Connecticut while

---

[15]Again, Petitioner moved to seal his reply brief (Dkt. #193), which motion was granted three days later (Dkt. #196), and on January 14, 2013, the unredacted reply brief was filed under seal.  (Dkt. #197).

[16]Additional facts also are addressed in Section II infra.

Sakaj and D.D. remained in Italy because Sakaj did not yet have her Italian passport.  (Jt. Stip. of Facts ¶ 1; Exh. 103 ["Demaj Depo."] at 25-29; 9/6/12 Sakaj Tr. at 22-26, 56, 138; 2/17/12 A.D. Tr. at 57-58; Exh. 40 (multiple photographs of girls at airport and on airplane)).[17]

Sakaj, an Albanian citizen, obtained Italian citizenship on July 6, 2007, and her Italian passport was issued on August 16, 2007.  (Jt. Stip. of Facts ¶ 8; Demaj Depo. at 26; 9/5/12 Sakaj Tr. at 59; 9/6/12 Sakaj Tr. at 64; Exhs. 78-79; Exh. E).  Prior to the issuance of her Italian passport, Sakaj could not travel to the United States with her Albanian passport. (Demaj Depo. at 23-24; 9/6/12 Sakaj Tr. at 22, 51).

On September 7, 2007, Sakaj, using tickets purchased by her family in the United States, traveled with the minor children to the United States, telling Demaj and the children's school that they were visiting Sakaj's parents for one month, and would return on October 7, 2007.  (Jt. Stip. of Facts ¶ 12; Demaj Depo. at 32-36; 9/5/12 Sakaj Tr. 10-11, 12-13; 9/6/12 Sakaj Tr. at 70-72; Exh. 5;[18] Exh. 6).  At the time the children arrived in the United States, A.D. was eight years old, K.D. was five years old, and D.D. was three years old.   (Jt. Stip. of Fact  ¶ 6; Exhs. 2-4).

---

[17]Demaj, A.D. and K.D. also took a day trip to New York City with Demaj's two brothers-in-law.  (Demaj Depo. at 26-29; 9/6/12 Sakaj Tr. at 23).  A.D. testified that when it was time to return to Italy, she "felt like crying[]" because she had enjoyed this day trip and New York City was "really pretty."  (2/17/12 A.D. Tr. at 78).

Sakaj acknowledged on cross-examination that she knew that during this trip, Demaj had met with an attorney about the prospects of relocating to the United States, but she did not know that the attorney had been located in New York City; the attorney advised Demaj that the family could not move here legally.  (9/6/12 Sakaj Tr. at 56-57; Demaj Depo. at 27-29).

[18]Sakaj testified that she signed Demaj's name on the letter to the school with his permission.  (9/6/12 Sakaj Tr. at 70-72).  Demaj denied that he had given his permission to do so. (Demaj Depo. at 34, 107).  See Sections II.C. and D. infra.

When Sakaj and the children first arrived in the United States, they lived with her parents in Simsbury, Connecticut for about one year.  (Jt. Stip. of Fact ¶ 13; 9/5/12 Sakaj Tr. at 11, 136).  On October 1, 2008, Sakaj and the children moved into their own apartment in Simsbury, and a year later, on October 1, 2009, they moved into a different apartment, also in Simsbury, where they have lived ever since.  (Jt. Stip. of Fact ¶ 13; 9/5/12 Sakaj Tr. at 11-12, 136-37).  Twelve days after their arrival in the United States, the children underwent physical exams, and within two weeks after their arrival in the United States, on September 24, 2007, Sakaj enrolled the children in school in Simsbury, where they have continuously remained enrolled to date. (Jt. Stip. of Facts ¶ 16; 9/5/12 Sakaj Tr. at 31-39; see Exhs. J, J-3, K-1, K-4, K-6, K-7, K-8, K-9).[19]

Demaj has visited the children four times in the United States since September 7, 2007, the most recent visit occurring in January 2010.  (Jt. Stip. of Fact ¶ 14; Demaj Depo. at 48-50, 61-62; 9/5/12 Sakaj Tr. at 181, 212; 9/6/12 Sakaj Tr. at 73-75).[20]   Demaj

---

[19]When they arrived in September 2007, D.D., who was not of school-age, attended a pre-school program at Education Play Care in Avon, Connecticut, and started kindergarten the following year, on September 2, 2008. (Exh. K-8).

[20]See Section II.C. infra.

Each time Demaj came to the United States to visit his family, he had other individuals driving him and sometimes staying with him in the area during visits.  (9/6/12 Sakaj Tr. at 75-76; see also Demaj Depo. at 82, 85-86, 87 (one or two friends waited for him at McDonald's or Friendly's Restaurants on January 27, 2010)).

In the police report from an incident on January 27, 2010, the Avon Police Officer reported that when he and another officer went to Demaj's last known address at the USA Motel on the Berlin Turnpike in Newington, the motel owner stated that Demaj, who was no longer there, had been staying there with "at least three other Albanians[.]"  (Exh. 101 (Avon Police Department Case/Incident Report)).

Sakaj also testified to another incident on April 24, 2008, when the Simsbury Police Department had been dispatched to Sakaj's apartment immediately after Sakaj had left the building for a quick errand, leaving the children unattended, upon a report from Demaj, who was in Italy at that time; A.D. was then nine years old.  (9/5/12 Sakaj Tr. at 90-92; 9/6/12 Sakaj Tr. at

communicates with the children from Italy by telephone or Skype.  (Jt. Stip. of Fact ¶ 15; Demaj Depo. at 115; 9/5/12 Sakaj Tr. at 38-39, 57, 141-42, 163; Exh. 86; <u>see also</u> 2/17/12 A.D. Tr. at 11, 54-55).

On June 20, 2008, Demaj filed an Application for Return of Minor Children with the Italian Central Authority at the Ministry of Justice.  (Jt. Stip. of Fact ¶ 17; Exh. 7).  The Petition for Return was forwarded to the United States State Department  (Jt. Stip. of Fact ¶ 18), and on February 11, 2009, Demaj commenced this action.  (Dkt. #1; Jt. Stip. of Fact ¶ 19).

Demaj has filed a criminal complaint in Italy against Sakaj for taking the children to the United States; Sakaj has filed civil actions in Italy seeking custody of the children; and in September 2009, Sakaj commenced divorce proceedings in the Connecticut Superior Court in Hartford, <u>Sakaj v. Demaj</u>, Docket No. HHD-FA-09-4046739S.  (Jt. Stip. of Fact  ¶ 21; 9/5/12 Sakaj Tr. at 28-30; 9/6/12 Sakaj Tr. at 12-13; Dkt. #189, at 3).  The Italian actions have been consolidated and archived pending the return of Sakaj and the children to Italy. (Jt. Stip. of Fact ¶ 21).   The custody issues in the divorce proceedings in Connecticut have been stayed pending a resolution of this federal action.  (9/6/12 Sakaj Tr. at 15-16; <u>see also</u> <u>id.</u> at 134).

On July 25, 2011, Sakaj and the three minor children were granted U-Visa immigration status which grants them lawful permanent resident status in the United States.

---

106-07; Exh. 77 (Simsbury Police Department Case/Incident Report)).

On cross-examination, Sakaj agreed that she and her children have not been threatened or assaulted by any of Demaj's Albanian friends in the United States.  (9/6/12 Sakaj Tr. at 106).

(Exh. D).[21]  The U-Visa was secured on the basis of a domestic violence charge,[22] filed with the Avon Police Department on January 27, 2010, in which Demaj was charged with threatening in the 2nd degree, under CONN. GEN. STAT. § 53a-62; risk of injury to a minor, under Conn. Gen. Stat. § 53-21(a)(1); and disorderly conduct, under CONN. GEN. STAT. § 53a-192.[23] (Exh. 101 (1-918 Supplement B, U Nonimmigrant Status Certification)).

## II. CONCLUSIONS OF LAW

The following constitutes the Court's conclusions of law, pursuant to FED. R. CIV. P. 52(a)(1):

### A. HAGUE CONVENTION OVERVIEW

The Hague Convention "establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained." 42 U.S.C. § 11601(a)(4).  Both the United States and Italy have adopted the Hague Convention.  In 1988, the United States Congress adopted ICARA, 42 U.S.C. § 11601 et seq., to implement the Hague Convention in this country.[24]  See In re Koc, 181 F. Supp. 2d 136, 145 (E.D.N.Y. 2001)(citations omitted). Once a petitioner establishes that the respondent wrongfully removed the children from their

---

[21]Specifically, Sakaj was granted U-1 Nonimmigrant status.  (Exh. D, at 2).  An U-1 Nonimmigrant "may submit an application for adjustment of status after he/she has been physically present in the United States for a continuous period of at least [three] years" after the date such nonimmigrant status is granted. (Id.).   Moreover, a U-1 Nonimmigrant is authorized to work in the United States. (Id.).

[22]See Section II.D.1. infra.

[23]Consequently, a report was made with the Connecticut Department of Children and Families ["DCF"] and there is an outstanding warrant for Demaj's arrest on these charges.  (See Transcript of Davis Testimony, taken September 7, 2012 ["9/7/12 Davis Tr."] at 36, 41; Exh. 101; Exh. G).

[24]The Convention and ICARA are further explained by Public Notice 957 of the State Department, 51 Fed. Reg. 10494, 1986 WL 133056 (March 26, 1986).

habitual residence,[25] the children must be returned to the country of habitual residence, unless the respondent can establish one of the four affirmative defenses.  Hague Convention, Arts. 12, 13.  Under the Hague Convention, the court "has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim."  Blondin v. Dubois, 189 F.3d 240, 245 (2d Cir. 1999)["Blondin II"](citations omitted).[26]

### B. PRIMA FACIE CASE OF WRONGFUL REMOVAL OR RETENTION

In order to prevail on a claim under the Hague Convention, Petitioner must show that:

> (1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of [Petitioner's] custody rights under the law of the State of habitual residence; and (3) [Petitioner] was exercising those rights at the time of the removal or retention.

Gitter v. Gitter, 396 F.3d 124, 130-31 (2d Cir. 2005).  Petitioner "must establish these requirements by a preponderance of the evidence."  Id. at 131, citing 42 U.S.C. § 11603(e)(1)(A).

---

[25]Article 3 of the Convention provides in relevant part:

The removal or the retention of a child is to be considered wrongful where –

(a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention;

 and

(b) at the time of removal or retention those rights were actually exercised, . . . or would have been so exercised but for the removal or retention.

[26]There have been four decisions in the case of Blondin v. Dubois.  The first three are cited in the most recent Second Circuit decision, Blondon v. Dubois, 238 F.3d 153 (2d Cir. 2001)["Blondin IV"], as follows: the first district court decision, Blondin v. Dubois, 19 F. Supp. 2d 123 (S.D.N.Y. 1998)["Blondin I"]; the first appeal, Blondin v. Dubois, 189 F.3d 240 (2d Cir. 1999)["Blondin II"]; and the remand, Blondin v. Dubois, 78 F. Supp. 2d 283 (S.D.N.Y. 2000)["Blondin III"].

In this case, Respondent has stipulated that: (1) the habitual residence of the children at the time they came to the United States in September 2007 was Italy (Jt. Stip. of Fact ¶ 22); (2) the removal of the children by Respondent was initially done with Petitioner's approval, but he gave approval only believing they would return, so that the continued residence of the children in the United States is not with Petitioner's approval and constitutes "wrongful removal" under the Hague Convention (id. ¶ 23); and (3) at the time the children left Italy, Petitioner had parental rights to the children and was exercising those rights, and Respondent also has parental rights to the children and is exercising those rights (id. ¶¶ 24-25; see also Dkt. #189, at 3 ("The parties have stipulated that . . . Demaj has established a prima facie case under the [Hague] Convention.")).   The stipulation, as it relates to "wrongful removal," is partially supported by the facts in this case.

Both Italy and the United States are signatories to the Hague Convention. The children are all under sixteen years of age.  They were habitually residing in Italy, as they had lived in Italy their entire lives until the children were wrongfully removed to the United States.  The removal was wrongful because it was in breach of the Petitioner's custody rights under Italian law, and Petitioner was actively exercising those rights as of the date of removal.   However, the breach of Petitioner's custody rights does not occur until the Petitioner's consent is withdrawn, and in this case, Respondent and the children left Italy in September 2007 with Petitioner's consent, and it was only after they did not return, one month later, as initially planned, that wrongful removal is established. Matovski v. Matovski, No. 06 Civ. 4259 (PKC), 2007 WL 2600862, at *11 (S.D.N.Y. Aug. 31, 2007).[27]

Once Petitioner satisfied his burden of showing that the children were wrongly

---

[27]See Section II.C. infra.

removed from Italy, the children must be returned unless Respondent establishes that any one of the four narrow exceptions under the Hague Convention applies.   42 U.S.C. § 11603(e)(2); 42 U.S.C. § 11601(a)(4).  Two of the exceptions must be proved by clear and convincing evidence:

> (1) that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation," pursuant to Article 13(b) of the [Hague] Convention; or (2) that the child's return "would not be permitted by the fundamental principles . . . relating to the protection of human rights and fundamental freedoms," pursuant to Article 20 of the Convention.

Koc, 181 F. Supp. 2d at 146, quoting Blondin II, 189 F.3d at 245.[28]

The other two exceptions, one of which is asserted in this case, must be proved by a preponderance of the evidence:

> (1) "judicial proceedings were not commenced within one year of the child's abduction and the child is settled in [his or her] new environment, pursuant to Article 12 of the Convention;" or (2) that the petitioner was "not actually exercising custody rights at the time of the removal, pursuant to Article 13(a) of the Convention."

Id., quoting Blondin II, 189 F.3d at 245-26 (additional citation omitted); 42 U.S.C. § 11603(e)(2)(B).  In addition, the Hague Convention permits this Court to consider the preferences of an older child.  See Hague Convention, Art. 13, 51 Fed. Reg. at 10,510; Koc, 181 F. Supp. 2d at 147 (additional citations omitted).  It is within the province of this Court to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views." Hague Convention, Art. 13.  As the Second Circuit has explained, this

---

[28]As discussed in Section II.D.1. infra, the "'Grave Risk' Defense, was originally pursued by . . . Sakaj but abandoned on August 17, 2012 ([Dkt. #]132) when concern was expressed that the Court lacked the resources to compensate [the] Court-appointed expert[ ] for testimony needed to prove that exception."  (Dkt. #189, at 3; see also Dkt. #195, at 1 n.1)

"unnumbered provision of Article 13 provides a <u>separate</u> ground for repatriation and that under this provision, a court may refuse repatriation <u>solely</u> on the basis of a considered objection to returning by a sufficiently mature child." <u>Blondin IV</u>, 238 F.3d at 166 (emphasis in original).

<u>C. WRONGFUL RETENTION</u>

While, as stated above, the parties stipulate that the habitual residence of the children at the time the children were wrongfully removed to the United States in <u>September 2007</u> was Italy (Jt. Stip. of Fact ¶ 22; <u>see</u> Dkt. #189, at 3), and that the continued residence of the children in the United States is not with Petitioner's approval  (<u>id.</u> ¶ 23), in their Joint Trial Memorandum, the parties then stipulate that these actions by Respondent constitute wrongful <u>removal</u> under the Hague Convention.  (<u>Id.</u>).  It was not until Petitioner's Amended Petition,[29] filed after the conclusion of the trial in this case, that Petitioner now contends, the stipulations notwithstanding, that Respondent has wrongfully <u>retained</u> the children in the United States.  (Dkt. #191, at 1, ¶ 1).

In this case, the parties stipulate that the initial removal of the children was done with Petitioner's consent.  (Jt. Stip. of Fact ¶ 23).  The Explanatory Report to the Hague Convention explains that in cases where the initial removal is consensual, the wrongful retention occurs when the "child ought to have been returned to [his or her] custodians or when the holder of the right to custody refused to agree to an extension of the child's stay in a place other than that of [his or her] habitual residence."  Elisa Perez-Vera, <u>Explanatory Report: Hague Conference on Private International Law</u>, in 3 Acts and Documents of the

---

[29]When Petitioner commenced this action on February 11, 2009, contrary to his contentions now, he filed his Petition "[a]s a result of the recent illegal and wrongful international removal by the Respondent of the parties' minor children from the jurisdiction of Italy on or about September 7, 2007 . . . . " (Dkt. #1, at 1, ¶ 1).

Fourteenth Session 430 (1980)["Explanatory Report"] ¶ 108; Matovksi, 2007 WL 2600862, at *11.

In accordance with this explanation, the wrongful retention occurred on or about October 7, 2007, the date upon which the children were to return to Italy but did not, and one year from that date is October 7, 2008.  (See Demaj Depo. at 33)(Demaj knew that Sakaj and the children's travel to the United States would be for "[o]ne month."). The Petition was filed in this case on February 11, 2009, which is outside the one-year period. Petitioner contends, however, that the wrongful retention did not occur until he became aware that Respondent did not intend to return in June 2008.  (Dkt. #191, at 29-30, citing In re Ahumada Cabrera, 323 F. Supp. 2d 1303, 1312-13 (S.D. Fla. 2004)).

### 1. PETITIONER'S BURDEN

Petitioner bears the burden of proving by a preponderance of the evidence that his children were wrongfully retained.  42 U.S.C. § 11603(e)(1).  Demaj must establish that Sakaj's retention of the children constitutes a breach of his parental rights of custody under the law of the State where the children habitually reside.  See Hague Convention, Article 3(a), 51 Fed. Reg. at 10,506.[30]  Demaj's custody rights arise by operation of Italian law and Sakaj does not assert that Demaj has relinquished such rights under Italian law.[31]

---

[30]While Petitioner uses his post-trial brief to assert now (consistent with his Amended Petition filed four days after the conclusion of the six-day trial spread over eight months) that the children were wrongfully retained and thus the Article 12 well-settled defense does not apply, Petitioner fails to address the law governing Petitioner's burden to establish a retention in breach of his custody rights and the application of the habitual residence inquiry.  Rather, Petitioner cuts and pastes language from the case law merely to support his contention that he commenced his Petition within one year of becoming aware of Respondent's "true intention not to return." (Dkt. #191, at 28-31; Dkt. #194, at 2-4). Accordingly, the Court will address all aspects of the wrongful retention analysis.

[31]Sakaj testified that Demaj pays child support for the children, though "he's not regular" in his payments.  (9/5/12 Sakaj Tr. at 101).  He is scheduled to pay $289/week.  (9/6/12 Sakaj Tr. at

In addition to establishing the right of custody of the children, Demaj bears the burden of establishing by a preponderance of the evidence that the children were retained in breach of those custody rights, and that he was exercising those custody rights at the time of the retention.  See Hague Convention, Article 3(b), 51 Fed. Reg. at 10,506; see Poliero v. Centenaro, No. 09-CV-2682(RRM)(CLP), 2009 WL 2947193, at *12 (E.D.N.Y. Sept. 11, 2009)(Magistrate Judge's Report and Recommendation adopted)(additional citation omitted), aff'd 373 Fed. Appx. 102 (2d Cir. 2010).  Petitioner must then establish that Respondent wrongfully retained the children in the United States and that they remained habitually resident in Italy for purposes of the Hague Convention.  Poliero, 2009 WL 2947193, at *12.[32] In order to determine a child's habitual residence, the Second Circuit has set forth the following standard:

> First, the court must inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared.  In making this determination the court should look, as always in determining intent, at actions as well as declarations.  Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points

---

111).

[32]Demaj relies on Poliero for the premise that the well-settled defense "does not apply" to an action commenced within one year of a child's wrongful retention. (Dkt. #194, at 3).  Poliero, unlike this case, involves a situation in which one parent retained the children in the United States after both parents accompanied the children from their habitual residence in Italy to the United States.  See Poliero, 2009 WL 2947193, at *3-8, 14 (petitioner, respondent and children came to New York for a "non-continuous and intermittent period of [eighteen] months[,]" but seventeen days after petitioner was served with an action for divorce and custody in New York, petitioner filed his Hague Convention Petition, and eight days later, respondent did not return to Italy). Additionally, in Poliero, while the court noted that the respondent did not claim that the case falls within one of the four exceptions set forth in the Hague Convention, and that the action was commenced well within one year of the children's wrongful retention, so the well-settled defense "does not apply[,]" the court went on to "consider the question of acclimatization in order to determine whether the children, regardless of the parents' intent, [had] become so acclimatized to the new country as to establish it as their new habitual residence."  2009 WL 2947193, at *11, 17. Demaj erroneously relies on the first premise discussed in Poliero, to the exclusion of the relevant analysis in the latter portion of the decision.

to the conclusion that the child has acclimatized to the new location and thus has <u>acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.</u>

<u>Gitter</u>, 396 F.3d at 134 (emphasis added).

### 2. PETITIONER'S KNOWLEDGE OF RESPONDENT'S INTENT

As discussed above, the parties stipulate that the minor children were habitually residing in Italy within the meaning of Article 3 of the Convention at the time of the children's removal from Italy on September 7, 2007. (Jt. Stip. of Facts ¶ 22). Demaj now argues that "[t]here is not a scintilla of evidence suggesting that Demaj knew that Sakaj did not intend to return to Italy with the children until June 2008 [when] they did not return[.] " (Dkt. #191, at 29).[33] The Second Circuit has confirmed that the "parties' shared intent is a question of fact" to be determined by the district court, <u>Daunis v. Daunis</u>, 222 Fed. Appx. 32, 34 (2d Cir. 2007)(citations omitted), and in this case, Petitioner's contention fails for several reasons.

As an initial matter, there is a wealth of evidence that Demaj knew that Sakaj did not intend to return to Italy, beginning within days of her removal of the children from Italy to Connecticut. As Demaj himself acknowledges, on September 9, 2007, two days after the children left Italy, "Respondent called [Petitioner] from the United States and informed him that she would not be returning to Italy and that she would be living with the minor children in the United States indefinitely." (Dkt. #1, at 5, ¶ 12).[34] Additionally, on or about

---

[33]Thus, Petitioner contends that he commenced this proceeding within one-year of June 2008, when he learned of the wrongful retention, so that the well-settled defense does not apply. (<u>Id.</u>).

[34]Additionally, on July 22 2007,  just prior to leaving Italy, Sakaj contacted Patrizia Brutti, a psychologist at the "office of A.S.U.R. – Territorial Zone No. 5 of Jesi – Minors Services and Office[,]" to express concern about her physical safety and that of her oldest daughter; after speaking with Brutti, Sakaj spoke with Sonia Radicioni from the District of Moie who then "made

September 16, 2007, weeks prior to the return date that she initially told Demaj, and only nine days after arriving in the United States, Sakaj's attorney in Italy, Myriam Fugaro, provided to Sakaj a police report filed by Demaj in Italy for the kidnapping of the children. (9/5/12 Sakaj Tr. at 21, 29).[35]

Demaj also testified that "[e]xactly two weeks, maybe even less" from the date that Sakaj left for the United States, Demaj received a letter dated September 7, 2007, from Attorney Fugaro, informing Demaj that Sakaj, "accompanied by her offspring, is in the United States, at the residence of her parents[,]" "left the marital home due to the continued physical and verbal violence to which she was subjected, as well as for the tension which the children were subjected to . . . ." (Demaj Depo. at 40-41; Exh. O).   In response to receiving this letter, seventeen days later, Demaj's attorney in Italy sent a letter to Attorney Fugaro which acknowledges receipt of Fugaro's letter.  (Exh. O).   Demaj testified as well that "[i]n 2007, [his] wife left for a month holiday and she never came back to Italy[]" (Demaj Depo. at 11), and that "[r]ight after receiving the letter [from Attorney] Fugaro[,]" he spoke with his brother-in-law in the United States who "confirmed that [Sakaj] wasn't going to come back."  (Id. at 43-44).

Moreover, when Sakaj left Italy, she brought "some of the clothes but [she did not]

---

the appropriate report to the district attorney at the Court for Minors of Marche about what [Sakaj] told her," and subsequently, Brutti received a communication from Sakaj's lawyer in Italy that Sakaj had gone to the United States with "no intention to return to Italy."  (Exh. 84; 9/6/12 Sakaj Tr. at 59, 116-18).  See note 53 infra.

[35]When asked at his deposition if he started any other legal proceedings against his wife before June 2008, he responded "I can't remember."  (Demaj Depo. at 105-06). He later testified that he "did start a legal proceeding against [his] wife, because she didn't come back with the children from abroad."  (Id. at 128).  The kidnapping action was filed within nine days of Sakaj arriving in the United States.

leave anything" in her home in Italy.  (9/5/12 Sakaj Tr. at 13).[36]  Sakaj testified that she

emptied her closet and most of her children's closet and "gave all [of her] clothes and [her]

belonging[s] to [her] friends." (Id.). See Poliero, 373 Fed. Appx. at 105 (finding that Italy

remained habitual residence when parties "maintained their personal belongings and

furniture in Italy[]" and maintained "continuous connections with Italy").   Additionally,

twelve days after their arrival in the United States, the children underwent physical exams

and within two weeks after their arrival in the United States, on September 24, 2007, Sakaj

enrolled the children in school in Simsbury, where they have continuously remained enrolled

to date. (Jt. Stip. of Facts ¶ 16; 9/5/12 Sakaj Tr. at 31-39; Exhs. J, J-3, K-1, K-4, K-6, K-8,

K-9).[37]

        In early 2008, Demaj traveled to the United States on two occasions – February 1 to

February 22, and from May 28 to June 5 – during which visits he spent time with his wife and

children, and Sakaj told Demaj she would return to Italy with the children when they finished

school in 2008.  (Demaj Depo. at 50 (three weeks), 60 (February 7 to February 20); 9/5/12

Sakaj Tr. at 25-26, 195 (visit was 20 days), 212 (same); Dkt. #1, at 5, ¶ 12).[38]  Sakaj

_____

        [36]Sakaj had to purchase an additional piece of luggage because she took so many articles of clothing with her. (9/6/12 Sakaj Tr. at 147-48).

        [37]See note 19 supra (D.D., who was not of school-age in September 2007, attended a pre-school program in Avon, and started kindergarten the following year, on September 2, 2008)(Exh. K-8).

        [38]Demaj also contends that Sakaj promised she would return if he bought a house, and in reliance on that promise, "Demaj engaged a real estate agent immediately upon returning to Italy [in February 2008] and entered into a contract to purchase a new home." (Dkt. #191, at 9, citing Demaj Depo. at 59 ("I got in contract with two real estate agents called Andreoli and Contacto Casa."), 60 ("I signed a contract.") & Exh. 35). During her cross-examination, Sakaj was equivocal about whether in early 2008 she had told Demaj that she would return to Italy in June 2008, when the children finished school.  (9/5/12 Sakaj Tr. at 194-95; see also 9/6/12 Sakaj Tr. at 32-35, 48).

        Demaj testified at his deposition that he entered into a contract to purchase a home and paid a "small deposit, a down payment, but it wasn't a huge sum of money[,]" the amount of

testified that in 2008, when she could not find an attorney in the United States to assist her in seeking a divorce, she considered returning to Italy, in part because of her illegal immigration status.  (9/5/12 Sakaj Tr. at 22-23).  Sakaj testified that she knew that after staying in the United States for more than three months from her initial arrival, she would be here illegally.  (Id. at 59).  Thus, according to Sakaj, she told Demaj that she would return because, in her words: "I was trying to find an attorney to file for divorce, and I had to . . . be here one year to file for divorce, and I was afraid if he do [sic] something and immigration can send me in Italy [sic].  That was my fear." (Id. at 27; see also id. at 209-11 ("[I] was always telling him that [I would return to Italy] to avoid that he – provoke [sic] him from calling immigration.").  However, after she spoke with an attorney here in the United

---

which Demaj could not recall.  (Demaj Depo. at 60-61, 108, 109, 116-18).  However, the realty company's statement, dated July 5, 2008, does not confirm Demaj's testimony, but rather, states:

> We hereby certify that Mr. Esheref Dema[j] . . . was our client during the time between 3/1/2008 and 5/31/2008, and during said time he looked at several realities with the purpose of purchasing one.
>
> According to what he said, Mr. Dema[j] . . . would have bought the apartment on the condition that his wife, Mrs. Frida Sakaj, would come back to Italy with the children.

(Exh. 35).  Moreover, Demaj also testified that within fifteen or twenty days after his return to Italy, in February 2008, Sakaj told him that she was not "interested" in the house because "[he] wasn't going to change."  (Demaj Depo. at 61, 109-11).

Demaj's attorney in Italy, Andrea Bucciarelli, testified at his deposition that he recalled a telephone conversation with Attorney Fugaro, Sakaj's attorney in Italy, while Attorney Bucciarelli was standing outside the juvenile court, just prior to a court proceeding regarding these parties, in which Attorney Fugaro advised him that Sakaj and the children were returning to Italy. (Exh. 113, Deposition of Andrew Bucciarelli, taken on August 27, 2012, at 7-9, 10-11, 13-14).  Although Attorney Bucciarelli remembered "with extreme precision" and "absolute[] certain[ty]" where he was when this telephone conference occurred, he could not recall, four years later, when the conversation took place, whether it was July, August or September of 2008.  (Id. at 11-13). Attorney Bucciarelli testified that "[p]robably at the end of 2008, or the beginning of 2009[,]" Attorney Fugaro confirmed this information in a second telephone call.  (Id. at 14-15).  Attorney Bucciarelli's recollection as of the timing of this conversation is not consistent with any of the evidence in this case.

States, she "decided to stay here." (Id. at 24-25).[39]

As evidence of Sakaj's promises to return to Italy, Demaj offered transcripts of "recorded telephone conversations" with Sakaj from February 2007 until February 2009. (Exh. 89, ¶ 2). Sakaj testified that Demaj recorded her and the children, "[w]ithout us knowing anything[,]" although he told her of the recordings in August 2012, and previously, she "had a feeling from his questions, when he questioned the girls[]" that he might be recording their conversations. (9/5/12 Sakaj Tr. at 142; 9/6/12 Sakaj Tr. at 128).[40] The fact that Demaj recorded his telephone conversations with Sakaj, only to attempt to use them against her later in this proceeding, is, of course, a matter for this Court's consideration.[41] That said, both of the conversations upon which Demaj relies occurred in July 2008 -- a month after he alleges that he first learned of the wrongful retention of the children.

In the phone conversation of July 30, 2008, which Sakaj did "not remember at all[,]" of which two pages of the transcript came into evidence, Demaj tells Sakaj that "[w]e leave in two days, at quarter to [ten] . . . [f]rom New York[;]" nowhere in the relevant excerpt does Sakaj explicitly respond that she is returning. (Exh. 96, at 2-3; see 9/5/12 Sakaj Tr. at 213-15, 218). In a second telephone conversation transcript that came into evidence, which Demaj curiously states is from "July of 2008[,]" without identifying the precise date

---

[39]As stated above, Sakaj commenced divorce proceedings in the United States in September 2009, Sakaj v. Demaj, Docket No. HHD-FA-09-4046739S, pending in the Superior Court in Hartford. (Dkt. #189, at 3; see 9/5/12 Sakaj Tr. at 30).

[40]Sakaj adamantly objected to the accuracy of the translation of the recorded telephone conversations, which her counsel appropriately argued bear a "trapping aspect." (See, e.g., 9/6/12 Sakaj Tr. at 44-47). Demaj told Sakaj that he has 176 records of conversations. (Id. at 128).

[41]According to Demaj, in 2010, when he called for D.D.'s birthday, Sakaj told him, "If you don't have a recorder go get – go get one, because I'm going to repeat this, you have always been a perfect and caring father." (Demaj Depo. at 114). Despite this self-serving statement, Demaj's transcripts of telephone calls date back to 2008.

as he had done in the exhibit referenced above, Demaj, as purported evidence of Sakaj's

intent to return to Italy, points to Sakaj's statement, "I will tell you when I'll come[.]" (Exh.

97, at 1).  On the next page of this exhibit, however, in response to Demaj's inquiry: "Ok.

When are you coming? Because I miss you[,]" Sakaj answers:

> One second.  I will come when you can give me the guarantee that I
> can trust you, the guarantee that when you should talk to your attorney
> and [INDISCERNIBLE] which you can do for me.  Nothing [INDISCERNIBLE] to me
> and that's it. [INDISCERNIBLE] I am not like [INDISCERNIBLE] <u>No, I am not
> coming on Saturday, I will come when</u> [INDISCERNIBLE] <u>to me. No, no, I am
> not coming to you if you</u> [INDISCERNIBLE] finish things and guarantee me
> about the things with your attorney.

(Exh. 96, at 2)(emphasis added).

Reading these two exhibits together, the first of which took place on Wednesday, July

30, 2008, makes clear that the second call occurred within that same week at some point

after the Wednesday conversation. As stated above, on Wednesday, Demaj tells Sakaj that

the purported flight schedule has been changed so that the flight in two days, that is, on

Friday, leaves New York at a quarter to ten in the evening, which, with a flight to Italy

(generally lasting at least six hours), thereby arrives in Italy on <u>Saturday</u>.  In the latter

conversation, Sakaj clearly tells Demaj that she is "not coming on Saturday." (<u>Id.</u>).  The

timing of this all is rather important given that Demaj claims there was "not a scintilla of

evidence" suggesting that Demaj knew that Sakaj did not intend to return with the children

until <u>June</u> 2008, when in fact, he relies on evidence from late July 2008 of conversations

about plane tickets, and discussions of travel plans of August 1-2, 2008, and yet, at the time

of these purported travel plans, Demaj had already filed his Application for the Return of

Minor Children filed with the Italian Central Authority at the Ministry of Justice (Ministero

della Guistizia, Dipartimento Giustizia Minorile), on July 23, 2008.  (Exh. 7).[42]

Moreover, in his Application for Return of Minor Children, filed in Rome, Italy, one month before these purported travel plans, Demaj did not assert that Sakaj wrongfully retained the children and he had not learned of that wrongful retention until she did not return in June 2008, but rather, he asserted that the "wrongful removal" of his children occurred when his "family didn't come back from [their] journey in the U.S.A. that they made, as Mr. Demaj knows, [to] meet Mrs. Sakaj's parents only for a few days.  They left on 7th September 2007."  (Dkt. #1; Exh. 7).[43]  Furthermore, in anticipation of his filing and for use in his application, on May 14, 2008, Demaj requested a copy of his criminal record from the Ministry of Justice.  (Exh. 38).   Petitioner's assertion that "[t]here is not a scintilla of evidence suggesting that Demaj knew that Sakaj did not intend to return to Italy with the children until June 2008 [when] they did not return[,]" has absolutely no support in the record and instead appears to be a desperate attempt at revisionist history.  (Dkt. #191, at 29).

---

[42]Additionally, although Demaj's counsel offered at trial the purported copy of the receipt evidencing that "Demaj bought and spent $2,000 on the plane tickets[,]" (9/5/12 Sakaj Tr. at 217), the exhibit actually is a "Tourist Package/Service Sale Proposal" from an Italian tourist agency in which "propose[d]" travel from New York to Rome for Sakaj and the children, "From 01/01/2008" "To 01/01/2008[,]" which date was seven months in the past, would cost 2,110.12 Euros, to be paid by July 31, 2008.  (Exh. 75).  According to a bank statement attached, a charge of 2,110.12 Euros was placed on Demaj's account on July 31, 2008, the day after, or the day of, Sakaj's statement that she is "not coming on Saturday."  Moreover, there is nothing in this exhibit, or any other exhibit, that evidences the purported dates of scheduled travel.  (Id.).

[43]Thus, the Application not only fails to support Demaj's wrongful retention claim, it also highlights another inconsistency on Demaj's part in that while he claims in the Application that his family did not return from "[their] journey in the U.S.A. that they made, as Mr. Demaj knows, [to] meet Mrs. Sakaj's parents only for a few days[,]" he testified in his deposition that he gave his written permission for his children to travel with his wife and he knew that such travel to the United States would be for "one month."  (Demaj Depo. at 32-33; Exh. 7).

3. HABITUAL RESIDENCY INQUIRY

Moreover, even if the Court agreed with Demaj's contention that the parties had a "shared intent" to return to Italy as of June 2008, the Second Circuit has made clear that the habitual residence inquiry does not end at the "shared intent" analysis.  See Mota v. Castillo, 692 F.3d 108, 115 (2d Cir. 2012). See also Poliero, 2009 WL 2947193, at *12-13; Zucker v. Andrews, 2 F. Supp. 2d 134, 136-38 (D. Mass. 1998), aff'd, 181 F.3d 81 (1st Cir.), cert. denied, 528 U.S. 1048 (1999).[44]  Additionally, while the shared intentions of the parents is the "primary consideration in determining a child's place of habitual residence[,]" Gitter also "advises that [the court] must . . . consider whether 'evidence points unequivocally to the conclusion that [the children have] become acclimatized to [their] new surroundings and that [their] habitual residence has consequently shifted'" to the United States.  Mota, 692 F.3d at 115 (citation & internal quotations omitted).  Thus,  contrary to Demaj's contention, the "shared intent of the parents is not dispositive of a child's habitual residence."  Gitter, 396

---

[44]Petitioner, however, glazes over the habitual residence inquiry by disregarding the acclimatization prong of the requisite analysis (Dkt. #194, at 4, n.2), and blatantly misstates to the Court that "[i]t is undisputed that the last time that Demaj and Sakaj shared an intention as to the habitual residence of the children, that shared intention was that the [c]hildren would reside in Italy. As such, Italy is the [c]hildren's habitual residence for the purposes of this dispute."  (Id., citing Petitioner's Amended Petition and Respondent's Amended Answer).  Petitioner relies on this assertion to bolster his contention that he did not learn of the wrongful retention of the children until June 2008, after the children had been in the United States for ten months, immediately prior to which, Sakaj planned to return to Italy with the children, and thus the parties' latest shared intention at the time of the wrongful retention was that the children would reside in Italy.

What the Amended Petition actually states is that "[t]he latest time at which Demaj and Sakaj shared an agreed upon intent with regard to the habitual residence of the children was when Demaj, Sakaj and the children lived in Italy."  (Dkt. #171, ¶ 22) (emphasis in original). Respondent's Amended Answer reads: "Ms. Sakaj admits that the last time at which she and Mr. Demaj shared an agreed upon intent with regard to the habitual residence of the children was when they lived in Italy."  (Dkt. #175, ¶ 22)(emphasis in original).  Thus, the Amended Petition and Amended Answer actually establish that it is undisputed that the last time the parties shared an agreed upon intent with regard to their habitual residence was when Demaj, Sakaj and the children lived in Italy, which is prior to September 7, 2007.

F.3d 135.

"[H]abitual residence is the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." Feder v. Evans-Feder, 63 F.3d 217, 224 (3d Cir. 1995).  This Court is mindful of the fact that it is "only in 'relatively rare circumstances' [that] a child's degree of acclimatization is 'so complete that serious harm . . . can be expected to result from compelling his or her return to the family's intended residence'" that a court "might . . . conclude that the child's habitual residence has shifted to his or her new location." Mota, 692 F.3d at 116 (citations omitted), quoting Gitter, 396 F.3d at 134.  Moreover, the Second Circuit has warned that a court "should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent," Gitter, 396 F.3d at 134, and that "[t]his is a difficult test to satisfy" as a child's habitual residence will "only be found to have 'shifted' due to acclimatization, if the child's relative attachments to the [two possible habitual residences] have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which [his or her] life has developed."  Poliero, 373 Fed. Appx. at 105, quoting Gitter, 396 F.3d at 133-34 (additional citations and internal quotations omitted).  That said, in cases involving older children, like this case, who are "capable of becoming 'firmly rooted' in a new country[,]" the court's attention "generally turns first to the child's perspective" and less weight is assigned to shared parental intent. Karkkainen v. Kovalchuk, 445 F.3d 280, 296 (3d Cir. 2006)(citation omitted).[45]

---

[45]The child in Karkkaninen was fourteen at the time of the court's decision, the same age that A.D. is now. Id. at 285.

Acclimatization requires a physical presence for a "sufficient" "amount of time." Gitter, 396 F.3d at 131.  In this case, at the time the children arrived in the United States, A.D. was eight years old, K.D. was five years old, and D.D. was three years old; as of June 2008, A.D. was nine, K.D. was six, and D.D. was four, and at the time of this decision, A.D. is fourteen, K.D. is eleven, and D.D. is nine.  The children have been in the United States for five and one-half years, which in D.D.'s case is more than half of his life, and in K.D.'s case, it is almost equal to the time that she lived in Italy.  Five years is a substantial amount of time, particularly for the children "of such tender age."  E.D.T. ex rel. Adamah v. Tayson, No. 09-CV-5477 (FB), 2010 WL 2265308, at *6 (E.D.N.Y. May 28, 2010)(period of almost one year is a substantial amount of time spent by a five-year old child), citing Falk v. Sinclair, 692 F. Supp. 2d 147, 161 (D. Me. 2010)(finding acclimization where seven-year old had spent one year in country of habitual residence, and "the amount of time during which [the child] lived primarily in Germany . . . is consistent with a finding of acclimization for a child of her age"); In re Kim, 404 F. Supp. 2d 495, 514-15 (S.D.N.Y. 2005)("the amount of time for a four-year old to acclimatize to a new residence is less than that for an older child[,]" concluding that a "handful of days" failed to suffice).[46]

---

[46]Conversely, in Mota, the Second Circuit concluded that the child, who had been in the United States for two years, since she was three and a half years old, living with her father in New York because her mother, who had the child illegally smuggled into the United States from Mexico, but who was repeatedly stopped at the border, prevented from coming to the United States, and even served a seventy-five day sentence for her repeated attempts to enter the United States to be with her daughter, had not acclimatized to the United States, and her return to Mexico would not "expose her to the severe harm one associates with a child's deprivation of [her] acclimatized life." Id. at 109-11, 116 (internal quotations & citations omitted).  In that case, the Second Circuit noted that the duration of two years that the child spent away from her "loving, supportive home in Mexico," "is not nearly so great" a duration of time for the Court to "presume that returning her" to Mexico would cause harm.  Id. at 116.

Similarly, in Poliero, the Court held that three minor children from Italy had not acclimatized to the United States when they had spent a "non-continuous and intermittent period of [eighteen] months" in the United States, returning to Italy for holidays and "extensive vacations

In this case, the children have been enrolled in school since two weeks after their arrival in the United States.[47]  They have consistently done well academically and are well adjusted; virtually every report card and teacher's report contains glowing praises of the children's academic progress, determination, and consideration of others.  (See Exhs. K-1, K-4, K-6, K-8, K-9; see also Exh. K-4, at 1-2 (November 2008 letter from A.D.'s  fourth grade teacher, observing that A.D. "has made wonderful progress[,] . . . she is making friends and has become quite social with her peers.")).   In the 2007-2008 school year, A.D. made "remarkable academic progress" going from "basically a non-English reader to reading at a second grade level in nine months."  (Exh. K-4, at 9).  Her teacher in the 2007-2008 school year noted that A.D. was "well-accepted and well-liked by her peers[,]" she became

---

of several months" to stay with friends, their father, and their paternal grandparents, and when in the United States, the children were enrolled in the only school in North America recognized by the Italian Ministry of Education, taking half of their classes in Italian.  2009 WL 2947193, at *14-21. But see also Roche v. Hartz, 783 F. Supp. 2d 995, 1001-02 (N.D. Ohio 2011)(schooling and academic activities supported conclusion that one year old and four year old had acclimatized to the United States after twenty-six months).  The facts in both Mota and Poliero differ from this case in important ways as the children in this case have not returned to Italy, have been in the United States continuously for five and a half years, have lived in the same town since their arrival, and have been continuously enrolled in school.

[47]While the Court focuses this discussion relating to acclimatization on the children's remarkable adaptation in their first year and a half in the United States, the Court cannot limit its consideration to the period when the initial Petition was filed as to do so would ignore four more years spent in the United States by these three young children --  time which exceeds or equals the lifetimes of the younger two children in Italy.  See Section II.D. infra.  This case greatly differs from the cases upon which Petitioner relies which, when considering the well-settled defense, support consideration of the children's position at the time of filing the Petition.  See, e.g., Koc, 181 F. Supp. 2d at 136, 140 (Petition was filed in August 2000 and the decision was issued five months later in January 2001); Zucker, 2 F. Supp. 2d at 134, 135 (Petition was filed on September 1997, the hearing was held in December 1997, and the decision was issued in April 1998, seven months after filing); Belay v. Getachew, 272 F. Supp. 2d 553, 555 (D. Md. 2003)(Petition was filed in March 2003, the hearing was held the following month, and ruling filed in July 2003, four months after filing).  Presumably Petitioner would have made this argument in relation to acclimatization had he addressed the habitual residency inquiry in any of his filings.  See note 44 supra.  Additionally, as discussed in Section II.D.1. infra, the delay of this case lies with both parties and thus equity does not dictate that this Court should disregard four years of these children's lives in determining whether they are acclimatized and later, whether they are well-settled.  See Section II.D. infra.

"inseparable" from another girl in her class, was "much at ease with the other students[,]" and she was "extremely happy." (Id.). Similarly, in her first year in the United States, K.D. made "rapid academic growth[,]" as well as "rapid social adjustment to her new classroom[,]" as she became "very popular and formed many close friendships that extended well beyond the classroom day." (Id. at 10). As Paula Fink, the ESL instructor for A.D. and K.D., testified, the children "seem[ ] very, very happy . . [,]" (id.), A.D. and K.D. were at grade level within two years of arriving in the United States, and in response to the inquiry of Demaj's counsel, Fink also opined that the children "acclimated" to the United States very quickly. (Transcript of Paula Fink Testimony, taken March 27, 2012 ["3/27/12 Fink Tr."] at 4, 7, 35-36).

In addition to academic involvement, a child's social engagements, "participation in sports programs and excursions," and "meaningful connections with the people and places" in the child's new country all point to the child being acclimatized. Karkkainen, 445 F.3d at 293-94 (citations omitted).[48] A.D. has sung in the school choir, and she has been involved in the school theater, and plays violin, as does K.D. (9/5/12 Sakaj Tr. at 40; Exh. K-4; 2/17/12 A.D. Tr. at 79). "Academic activities are among the most central in a child's life and are therefore highly suggestive of acclimatization." Roche v. Hartz, 783 F. Supp. 2d 995, 1001 (N.D. Ohio 2011), citing Robert v. Tesson, 507 F.3d 981, 996 (6th Cir. 2007). In addition, A.D. and K.D. have played tennis during the school year and in the summer, and

---

[48]In Jenkins v. Jenkins, 569 F.3d 549, 556 (6th Cir. 2009), the Sixth Circuit held that the district court properly concluded that the child was acclimatized to life in the United States after considering that the child was attending preschool in the United States and was "doing well in that environment, having attained both Hebrew and English language skills commensurate with his age and learning opportunities[;]" the child enjoyed a weekly routine, "frequent summertime visits to fountains in a nearby water park, weekly trips to the synagogue with his grandmother, and attendance at numerous birthday parties for young friends from both preschool and synagogue." (footnote omitted).

more recently, D.D. has played soccer and tennis as well.  (9/5/12 Sakaj Tr. at 40-41 & Exh. L-2).  A.D. enrolled in tennis lessons within the first month of arriving in the United States. (2/17/12 A.D. Tr. at 11; 9/5/12 Sakaj Tr. at 155).[49]  Moreover, all of the children speak English fluently, "like natives[]"(3/27/12 Fink Tr. at 7), but none of the children can now communicate in Italian.  (2/17/12 A.D. Tr. at 20-21; 9/5/12 Sakaj Tr. at 57-58).  A.D. testified that while she knew only "the basics[]" of English when she first arrived to the United States five years ago (2/17/12 A.D. Tr. at 19), she now thinks in English (id. at 21). According to A.D., she "forgot" Italian in her first or second school year here -- third or fourth grade.  (Id. at 20-21).  The children have cultivated many friendships in the United States since their arrival in 2007, and they have a large family structure in Connecticut, but they have no friend relationships remaining in Italy.  See Section II.D.3. infra.

After considering all of the children's substantial social and academic adjustment in the United States, made over time that equals or surpasses the amount of time that the younger two children lived in Italy,[50] this is one of the "'relatively rare circumstances'" wherein the children's "degree of acclimatization is 'so complete that serious harm . . . can be expected to result from compelling'" their return to Italy.  Mota, 692 F.3d at 116, quoting Gitter, 396 F.3d at 134.  Forcing the children's return to Italy would be "tantamount to taking the child[ren] out of the family and social environment in which [their lives have] developed." Daunis, 222 Fed. Appx. at 34 (citation & internal quotations omitted).  Thus, this Court "conclude[s] that the [children's] habitual residence has shifted to [their] new location." Mota, 692 F.3d at 116, quoting Gitter, 396 F.3d at 134.  Moreover, just as in Roche, "the

---

[49]A.D. had been one of the top young tennis players in Italy.  See note 64 infra.

[50]See note 46 supra.

interplay between Petitioner['s] . . . prima face case, in which he must prove when the children were wrongfully removed or retained, and [Respondent's] Article 12 defense [applicable to wrongful removal], which establishes a one-year limitations period, puts Petitioner in a Catch-22 and leaves the Court unable to grant him relief."  783 F. Supp. 2d at 1001.

### D. APPLICATION OF THE "WELL-SETTLED" DEFENSE

Article 12 of the Convention allows a court to deny a petition if the Respondent shows, by a preponderance of the evidence, that the children are "well-settled" "in [their] new environment." 42 U.S.C. § 11603 (e)(2)(B).  The framers of the Convention "recognized that although its aim is to ensure the return of abducted children without reaching the merits of the underlying custody disputes, there could come a point at which a child would become so settled in a new environment that repatriation might not be in [his or her] best interest." Blondin IV, 238 F.3d at 164, citing Explanatory Report ¶ 107.   While the Convention itself does not define what constitutes a child being "settled in [his or her] new environment[,]" Hague Convention, Art. 12, the United States State Department has established that "nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof[]" in asserting the well-settled defense.  Public Notice 957, Text & Legal Analysis of Hague International Child Abduction Convention, 51 Fed. Reg. 10494, 10509, 1986 WL 133056 (March 26, 1986).  Several factors are considered in determining whether or not a child has become settled:

> the age of the child[;] the stability of the child's residence in the new environment[;] whether the child attends school or day care consistently[;] whether the child attends church [or other religious institutions] regularly[;] the stability of the mother's employment[;] and whether the child has friends and relatives in the new area.

Lozano v. Alvarez, 809 F. Supp. 2d 197, 230-31 (S.D.N.Y. 2011)(multiple citations omitted),

aff'd, 697 F.3d 41 (2d Cir. 2012); Koc, 181 F. Supp. 2d at 152 (same); see also In re:

Filipczak, 838 F Supp. 2d 174, 182 (S.D.N.Y. 2011)(same), aff'd, 2013 WL 692694 (2d Cir.

Feb. 27, 2013); Matovski, 2007 WL 2600862, at *13 (multiple citations omitted)(same);

Reyes Olguin v. Cruz Santana, No. 03 CV 6299 (JG), 2005 WL 67094, at *8 (E.D.N.Y. Jan.

13, 2005)(citations omitted)(same); Diaz Arboleda v. Arenas, 311 F. Supp. 2d 336, 343

(E.D.N.Y. 2004)(citation omitted)(same).  In addition, some courts consider the immigration

status of the parent and children.  See In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir.

2009). To reach a finding of well-settled, the Court must be presented with "substantial

evidence of significant connections" to the new environment.  Koc, 181 F. Supp. 2d at 152

(internal quotations & multiple citations omitted).  That said, "'well-settled' means more than

having a comfortable material existence."  Lops v. Lops, 140 F.3d 927, 946 (11th Cir. 1998),

cert. denied, 525 U.S. 1158 (1999).

### 1. UNCLEAN HANDS

As an initial matter, Demaj contends that Sakaj has rendered her children "well-settled" by having made false allegations of abuse, litigating that issue "for years and then dismiss[ing] those claims with prejudice, mid-trial," and securing legal status in the United States through fraud, false allegations and a violation of a Court order. (Dkt. #191, at 1, 7-11, 14-26).  Accordingly, Demaj contends that Sakaj, through her "years of delay caused by her fraud" has "unclean hands in connection" with the "well-settled" defense.  (Id. at 1, 35-36; see 9/5/12 Sakaj Tr. at 115).

The doctrine of unclean hands, which is named for the equitable maxim that "he who comes into equity must come with clean hands," is a "self-imposed ordinance that closes the

doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he [or she] seeks relief, however improper may have been the behavior of the defendant." Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945). However, the application of the doctrine of unclean hands to a Hague Convention action would "undermine the [goals of] the Hague Convention." Karpensko v. Leendertz, 619 F.3d 259, 265 (3d Cir. 2010); see also Uzoh v. Uzoh, No. 11-CV-9124, 2012 WL 1565345, at *6 (N.D. Ill. 2012 May 2, 2012)("The Hague Convention does not recognize unclean hands as a defense."), citing Karpensko, 619 F.3d at 265.[51]  The foregoing notwithstanding, Demaj's assertions are addressed below.

Just over one month after Demaj commenced this action, Sakaj, in her Motion for Appointment of Counsel, for Psychological Evaluations and for Postponement of Hearing Date, filed March 26, 2009, articulated the three defenses that she would pursue in this case: well-settled, mature child, and grave risk. (Dkt. #13). For the next three years, as detailed extensively in footnote 1 supra, both sides sought no less than five extensions of time, many of which were on consent, or were at the request of Demaj. On June 20, 2011, Demaj began the process to take depositions in Italy (Dkt. #47), which was immediately approved by Judge Dorsey (Dkt. #48), but such depositions did not take place until five months later. Thus, the delay of this case hardly lies only with Sakaj.

When this case came before this Magistrate Judge in January 2012, first upon referral from the late Judge Dorsey (Dkt. #52), and then upon consent of the parties (Dkt. #80),

---

[51]In Karpensko, the mother moved with the child and refused to provide their new address to the father, who "snatched" his daughter from school and "ran with her from Germany to Dubai to the United States." 619 F.3d at 261-62, 266. The mother then brought a Hague Convention action for the return of her daughter. Id. at 262. The Third Circuit held that "if relief . . . were unavailable to parents with allegedly unclean hands, the well-being of the abducted child, which is the main purpose of the Hague Convention, would be ignored." 619 F.3d at 266.

Sakaj pursued her defenses, including the grave risk defense, largely through the testimony and report of Dr. Mantell, who served as the Court-appointed psychologist, at this Court's expense. (See Dkt. #16; see also Dkt. #29 (Dr. Mantell's deposition at this Court's expense); Dkts. ##35-37, 44-46 (payment for preparation and testimony time of Dr. Mantell)).  After deposing Dr. Mantell and reviewing his report (see Dkt. #89, Exh. A), Demaj objected to Dr. Mantell testifying and retained his own expert, Dr. Benjamin Garber, to rebut the findings and conclusions of the Court-appointed expert.  (See Dkts. ##67-68, 83, 87, 90-91).  As this Magistrate Judge held on February 15, 2012, in overruling   Petitioner's Objection to Testimony of Dr. David Mantell (Dkt. #83):

> There is no basis to Petitioner's objection, for a number of reasons. First, Dr. Mantell issued his report on March 22, 2010, nearly two years ago, and was deposed on March 8, 2011, almost one year ago.  At Petitioner's request, on July 27, 2010, Dr. Mantell prepared a supplemental report, to which Respondent objected.  Petitioner had more than ample time in which to lodge his concerns about Dr. Mantell's methodology and report, and obviously did lodge some concerns prior to July 27, 2010, instead of belatedly raising this broad-based issue literally on the eve of trial.  Second, contrary to the Petitioner's arguments, Petitioner did participate in and was included in Dr. Mantell's evaluation (see Dkt. #28), so he is hard pressed to object to his appointment at this time.  Third, Dr. Mantell was appointed by the Court and it was Petitioner's retention of Dr. Garber, in early 2012, that shifted the landscape so that Dr. Mantell is now perceived to be on Respondent's side. . . .

(Dkt. #89, at 1-2)(emphasis in original).  Just prior to Dr. Mantell's testimony on February 16, 2012, the Court ruled that Respondent

> may examine Dr. Mantell . . . as planned . . . [and] Petitioner's counsel may choose to defer his cross-examination of Dr. Mantell until a later time, or may choose to commence his cross-examination of Dr. Mantell and at some point, then choose to continue such cross-examination until a later time; and Dr. Mantell may be recalled at a later time, either in the case-in-chief or as a rebuttal witness to Dr. Garber, if Dr. Garber testifies on behalf of Petitioner.

(Dkt. #94). After Dr. Mantell testified on February 16, his testimony was continued, due to

scheduling conflicts on his part, to September 2012, and then to October 2012.  (See Dkts. ##94, 96, 115-16, 121-24, 133).    Counsel, therefore, were well aware of the depth of involvement of Dr. Mantell, and the expectation, as of mid-2012, of Dr. Mantell's further commitments to this matter.   Thereafter, on August 14, 2012, this Court held a telephone conference with counsel during which the Court expressed concern that due to continuing budgetary cutbacks, the Court lacked the resources to compensate fully the Court-appointed experts, including Dr. Mantell, for testimony needed to prove the grave risk exception; in light of this unexpected dilemma, the Court proposed to continue to hear testimony as to the two other defenses and to hold further testimony from Dr. Mantell as to the grave risk defense for a later time and only if necessary.  (See Dkt. #189, at 3; see also Dkts. ##127-28, 132, Dkt. #195, at 1, n.1).[52]

Three days later, on August 17, 2012, Sakaj filed a Motion to Withdraw the "grave risk" defense (Dkt. #132), which motion was granted with prejudice on August 22, 2012. (Dkt. #140). Thus, while Petitioner places great emphasis on Respondent's withdrawal of this defense three years into the case, Respondent's representation, as restated in detail above, accurately reflects the course of events in this case.  Furthermore, based on this Court's familiarity with the progression of events, in the period prior to, and particularly, in this past year that this case has been with this Magistrate Judge, and in light of the posture of the case in August 2012, this Court, despite Petitioner's urgence to do so, will not impart negative credibility towards Respondent for her decision to withdraw the "grave risk" defense, and instead pursue the "well-settled" and mature child defenses. (See Dkt. #191;

---

[52]See note 6 supra (reflecting that counsel already had agreed to bifurcate Dr. Mantell's testimony due to his heavy schedule).

<u>see also</u> 9/5/12 Sakaj Tr. at 225 (Petitioner's counsel "recognize[d] and [was] willing to cooperate with the Court's concerns with respect to, . . . the cost issues of Dr. Mantell.")).

Not surprisingly, the testimony and exhibits admitted from the parents conflict on most of the critical issues in this case.  When faced with conflicting testimony, "this Court must make credibility determinations based on its perception of the parties as witnesses and on the evidence offered to support or refute the parties' testimony." <u>Delvoye</u>, 224 F. Supp. 2d at 848-49 (footnote omitted); <u>see also In re Kim</u>, 404 F. Supp. 2d at 498-500 (to resolve inconsistencies, "the Court is required to make certain findings regarding the credibility of the witnesses").  In this case, even if the doctrine of unclean hands applied to a Hague Convention matter, which it does not, this Court neither finds Demaj more credible than Sakaj and his daughter, nor does this Court believe, in light of all of the evidence before it, that Sakaj manufactured allegations of abuse, coached her daughter to testify in a manner consistent with such allegations, and calculated to pursue such false allegations for three years, all with the specific intent to delay this case and to later argue that the children are well-settled in the United States.[53]

---

[53]As to the issue of credibility, the assessment of which is within this Court's purview, Demaj's insistence that the Court defer to the portions of the nine largely repetitive Declarations (Exhs. 26-34), his deposition testimony, and the deposition testimony of his family and colleagues (Exhs. 103-13) that counter Sakaj's allegations of abuse, does not undermine the credibility of Sakaj and A.D., particularly with regard to one incident about which there is substantial agreement.

Sakaj testified that the reason that she wanted to leave Italy was that in July 2007, Demaj began to abuse A.D. (9/6/12 Sakaj Tr. at 118-19). Specifically, Sakaj stated that although she wants her children "to have a father[,]" when Demaj "start[ed] hitting A.D., that was – I was not sure if that family was good enough to be together because I didn't want my kids to get abused like I was. I didn't want my girls to end up like me, being abused from their husband. And I didn't want my son to be like my husband."  (<u>Id.</u> at 127-28).

Demaj's sister was deposed on the issue of this particular July 2007 incident, about which Mirella Demaj testified that she heard "quarreling" upstairs and "soon after[]" her brother went upstairs, "[she] heard [A.D.] crying.  And then the situation escalated and degenerated, so I heard noises upstairs and screams[.]" (Exh. 105, Mirella Demaj Deposition, taken November 18, 2011

Demaj also contends that Sakaj and the children secured their legal status through fraud, false allegations and a violation of a Court order.  (Dkt. #191, at 18-20).  Sakaj and her children are holders of a U-Visa.[54] (9/5/12 Sakaj Tr. at 60; Exh. D).  As this Court made

---

["M. Demaj Depo."] at 26-27). Mirella Demaj "understood that [Demaj] has spanked [A.D.], that's [what]  happened[,]" and it was the "first time that he had spanked [A.D.]."  (Id. at 27, 40).  She testified that she never saw Demaj strike any of the children or Sakaj, but she also testified that right after this incident, "it was apparent that [Sakaj] didn't want [Mirella]" in her home any more. (Id. at 29, 35-36, 44-45).  Sakaj testified that Mirella Demaj had witnessed this incident.  (9/6/12 Sakaj Tr. at 69).  Like Sakaj, Mirella Demaj has a law degree, after previously having been employed as a nurse.  (M. Demaj Depo. at 25-26, 48).

 Demaj admitted to having "spanked" A.D. on the buttocks on one occasion when A.D. and K.D. were fighting, after which Sakaj pushed him, but he "absolutely" did not respond physically towards his wife, nor had he ever hit her or done anything to emotionally or physically harm his wife.  (Demaj Depo. at 67-69, 74, 101, 122-23).  According to Demaj, after the July 2007 incident, his wife and children, looking "[s]lightly upset, but tranquil, quiet[,]" left to go to the beach, and it was only later that he learned they had gone to the emergency room. (Id. at 69-71, 123). Demaj denies that he ever hit, threatened, pushed or shoved Sakaj, that he ever slapped A.D., caused her to have red marks or bruises, or ever used harsh or abrasive language in relation to her tennis performance, and denied that he ever pushed Sakaj down a flight of stairs. (Demaj Depo. at 63-64, 71-72, 73-74).  Demajo claimed that A.D., like Demaj, has "very delicate and soft skin," such that "in two seconds," a "red mark[]" would appear. (Demaj Depo. at 101, 123).  Sakaj had reported to the emergency room that Demaj "had beaten [A.D.] with a fist[,]" whereas A.D. reported that Demaj had spanked her bottom.  (9/6/12 Sakaj Tr. at 150-51).

As stated above, other than to this issue of credibility and unclean hands, the substance of these allegations is not at all relevant to the well-settled and mature child defenses.

At the conclusion of the trial, Sakaj asked the Court to disregard the Italian depositions, Exhs. 94, 103-13, which previously had been admitted, as irrelevant to the legal issues that remain in this lawsuit (9/7/12 Tr. at 82-89); that request is denied, as the Court has carefully reviewed all these transcripts, but as just stated, these exhibits do not sway the Court to reject the testimony of Sakaj, and of A.D., as being inherently incredible.

Petitioner also submitted the DVD videos of the depositions of Paolo Perticaroli (two discs), of Ardian Zazo (one disc), and of Demaj (three discs).  The Court has viewed all three depositions, most importantly, the Demaj deposition, which lasted from 4:07 p.m. until 10:36 p.m.  (Demaj Depo. at 1, 6, 130).  For completion of the record, the plastic case containing these six discs will be marked in full as Petitioner's Exh. 114.

However, the Italian Declarations, Exhs. 26-34, will remain for identification purposes only, as Sakaj has not had an opportunity to question the declarants, unlike the deponents.

[54]A U-Visa may be granted to a victim and qualifying family members who are the victim of qualifying criminal activity; have suffered substantial physical or mental abuse as a result of having been a victim of qualifying criminal activity; possess information concerning the qualifying criminal activity of which the applicant is a victim; a Federal, State or local government official investigation

clear in its Ruling on Petitioner's Motion to Compel, filed February 14, 2012 ["February 2012

Ruling"], 2012 WL 476168, and again in its Ruling on Pending Motions, filed March 21, 2012,

2012 WL 965214, it is only the fact that the U-Visa exists that matters to the Court, and not

the circumstances under which it was issued.[55]  Moreover, as discussed in the February 2012

Ruling, in order to obtain U Nonimmigrant Status, the petitioner for such status must provide

"a certification of helpfulness from a certifying agency.  That means the victim must provide

a U Nonimmigrant Status Certification . . . from a U.S. law enforcement agency that

_____

or prosecuting a qualifying criminal activity certifies that the victim has been, is being, or will likely
be helpful to the official in the investigation or prosecution; and the criminal activity violated the
laws of the United State or occurred in the United States or its territories. See
http://www.uscis.gov/files/form/i-918instr.pdf (last visited Jan. 18, 2013).

[55]In her response to the Petition, filed on March 26, 2009 (Dkt. #12), Sakaj represented
that "[w]ith the permission of the Court and counsel for . . . Demaj, passports for the children and .
. . Sakaj are in the custody of counsel for . . . Sakaj, where they will remain until the Court
authorizes their release to . . . Sakaj." (¶ 17).  When Sakaj applied for the U-Visa, she was
required to present her original passport in connection with her application. (9/5/12 Sakaj Tr. at
191-92), and Sakaj testified that her counsel provided her with the passports despite the Court
order.  (Id. at 192).

The actions of Sakaj's counsel were in clear violation of Judge Dorsey's order, as
appropriately argued by Petitioner's counsel. (9/6/12 Sakaj Tr. at 2-4, 5-6).  Petitioner's counsel
thus argued that "everything that happen[ed] by the relinquishment of that passport and not with
the authorization of Judge Dorsey or some other legitimate authority is in violation of that court
order," so that "all of the evidence which follows is tainted, including the work permits, the driver's
license, [and] the medical insurance cards[.]" (Id. at 3-4).  As to Petitioner's suggestion that a
"simple motion[]" was all that was required, Respondent's counsel replied that she choose not to
seek court permission because Judge Dorsey "was very ill at the time and I didn't think that [the
issue] rose to the point where I needed to get authority.  If there was a misdeed here, it was
mine." (Id. at 4).

After counsel's argument, the Court held that "particularly since [R]espondent's counsel
has indicated that it was her decision to do this, not the [R]espondent['s,]" the Court refuses to
adopt Petitioner's argument that is "analogous in a criminal context to the fruit of the poisonous
tree approach, so that any impropriety on the part of [R]espondent's counsel would be attributable
to [R]espondent herself." (Id. at 7).

The Court is disturbed that Respondent's counsel released the original passport to her
client, despite a court order to the contrary; it is difficult to imagine that Judge Dorsey would have
denied an ex parte application to that effect, even when he was ill.  Petitioner's counsel are, of
course, free to pursue whatever remedies they deem appropriate under the circumstances.

demonstrates that the petitioner 'has been helpful, is being helpful, or is likely to be helpful' in the investigation or prosecution of criminal activity." See http://uscis.gov/portal/site "Questions & Answers: Victims of Criminal Activity, U Nonimmigrant Status Q: What Prevents Any Foreign National From Claiming This Status By Saying They Were a Victim of a Crime?" (last visited Jan. 25, 2013).  Additionally, an application for such visa does not entitle one to such a visa.  Rather, the relevant statutes and regulations leave the final decision to the discretion of the Department of Homeland Security.  See 8 U.S.C. § 1101(a)(15)(U)(the Secretary of Homeland Security determines whether petitioner has fulfilled statutory criteria); 8 C.F.R. § 214.14(c)(4)(giving United States Citizenship and Immigration Service ["USCIS"] "sole discretion[]" to determine the "evidentiary value" of the materials submitted by a petitioner); 8 C.F.R. § 214.14(c)(5)(I) ("If USCIS determines that the petitioner has met the requirements  for U–1 nonimmigrant status, USCIS will approve Form I–918.").[56]  Just as this Court held in the February 2012 Ruling, "Petitioner's claim that Respondent 'has attempted to improve her litigation position by obtaining a U-Visa through fraud . . .' is not well-taken by this Court."  2012 WL 476168, at *5 (citation omitted).

     2.TOLLING

     The "well-settled" exception only applies if the proceedings for the return of the children were filed more than one year after the date of the wrongful removal or retention. The term "'commencement of the proceedings,' as used in [A]rticle 12 of the Convention, means . . . the filing of a petition" in a civil action for the return of a child.  42 U.S.C.  § 11603(f)(3).  The proceedings in this case were commenced on February 11, 2009, the date

---

[56]Furthermore, there was a substantiated report by DCF resulting from a referral of child abuse by a mandated reporter that arose from the incident upon which Sakaj sought the U-Visa. (See Exh. G).

upon which the Petition was filed.  (Dkt. #1).[57]  In this case, the parties dispute the initial

date of the wrongful removal or retention, and Petitioner contends that the one-year period

in Article 12 should be equitably tolled.  (Dkt. #191, at 28-32).

Neither Article 12 of the Hague Convention nor ICARA explicitly permit or prohibit

tolling of the one-year period before a parent can raise the well-settled defense.  Lozano v.

Alvarez, 697 F.3d 41, 45 (2d Cir.  2012)(footnote omitted).  The "default presumption" under

the Hague Convention is that a child "shall be returned to the state from which she originally

was wrongfully removed unless both of two conditions are met: (1) one year has elapsed

between the date of wrongful removal and the date proceedings commence; and (2) the

child is found to be 'now settled in [his or her] new environment.'" Id. at 51, quoting 42

U.S.C. §§ 11603(b), (f)(3).   "The [well-settled] exception is a recognition that, after the

passage of a sufficient period of time, the child's interests in remaining in an established

environment may be superior to the interest of the petitioning parent." Matovski, 2007 WL

2600862, at *12, citing Explanatory Report, § 107.   The purpose of the equitable tolling of

the one-year element of the well-settled defense would be "to ensure that a parent who

takes intentional and significant steps to conceal his or her children for more than one year

will not be rewarded for that misconduct by creating eligibility for an affirmative defense not

otherwise applicable[,]" which includes inquiries into "active concealment" by the respondent,

"efforts to locate the child" by the petitioner, the request for "criminal proceedings" by the

petitioner against the respondent, and the appropriate "length of tolling," if any.  See, e.g.,

Van Driessche v. Ohio-Esezeoboh, 466 F. Supp. 2d 828, 847-55 (S.D. Tex. 2006)(multiple

---

[57]As discussed in Section II.C. supra, Demaj contends that the well-settled defense does
not apply as he commenced proceedings within one year of Sakaj's wrongful retention of the
children, or in the alternative, the one-year period in Article 12 should be equitably tolled.  (Dkt.
#191, at 28-32).

citations omitted); see also In re B. Del C.S.B., 559 F.3d at 1009-16; Sita-Mambwene v. Keeton, No. 09 CV 913 (ERW), 2009 WL 2836430, at *4-6 (E.D. Mo. Aug, 28, 2009); In re Hague Child Abduction Application, No. 08-2030-CM, 2008 WL 913325, at *9-12 (D. Kan. Mar. 17, 2008).

Equitable tolling "would place the interests of the petitioning parent above those of the potentially settled child simply because the petitioner may have had a good reason for failing to file sooner." Matovski, 2007 WL 2600862, at *12 (citation omitted). In Matovski, U.S. District Judge P. Kevin Castel in the Southern District of New York observed that one Court of Appeals had concluded that equitable tolling applies to the one-year period in Article 12, see Furnes v. Reeves, 362 F.3d 702, 723 (11th Cir.), cert. denied, 543 U.S. 978 (2004), and yet other district courts had not reached a consensus, although a majority agreed that tolling applies.  2007 WL 2600862, at *11, citing Belay v. Getachew, 272 F. Supp. 2d 553, 563 (D. Md. 2003)(holding that equitable tolling applies); Mendez Lynch v. Mendez Lynch, 220 F. Supp. 2d 1347, 1362-63 (M.D. Fla. 2002)(same); Anderson v. Acree, 250 F. Supp. 2d 872, 875 (S.D. Ohio 2002)(expressing doubts that equitable tolling applies).  Judge Castel then concluded that "[b]ecause the denial of a petition pursuant to Article 12 is discretionary, equitable tolling is unnecessary to deter an abductor from concealing the whereabouts of a wrongfully removed or retained child." 2007 WL 2600862, at *12.  Moreover, the Matovski court observed, "[e]quitable tolling would be inconsistent with the Convention's careful balancing of interests and [thus] it has no application to Article 12."  Id.

Most recently, in a decision filed just five months ago, on October 1, 2012, the Second Circuit made absolutely clear that equitable tolling of the one-year period "would undermine [the] purpose" of Article 12, and thus the well-settled defense available under

Article 12 is not subject to equitable tolling.  Lozano, 697 F.3d at 54.  Accordingly, Demaj's assertion that the one-year period in Article 12 should be equitably tolled fails.  (Dkt. #191, at 28-32).

### 3. FACTORS FOR CONSIDERATION

Although it is undisputed that the minor children have been in the United States for five and a half years,[58] Sakaj must show by a preponderance of the evidence that the children are "in fact settled in or connected to the new environment so that, at least inferentially, return would be so disruptive with likely harmful effects[,]" and there must be "substantial evidence" of significant connections made by the children.  Koc, 181 F. Supp. 2d at 152 (multiple citations & internal quotations omitted).

### a. AGE OF THE CHILDREN AND STABILITY OF RESIDENCE

A.D. first came to the United States when she was in third grade (2/17/12 A.D. Tr. at 18), and at the time that she testified, A.D. had just turned thirteen and was in the seventh grade; she is now fourteen and an eighth grader. (Id. at 14, 22).  As discussed in Section II.C. supra, K.D. is now eleven, having spent the same amount of time in the United States as she spent in Italy, and D.D. is nine, having lived here much longer than he lived in Italy.  (See 9/5/12 Sakaj Tr. at 11).

When they first arrived in the United States, Sakaj and the children lived with Sakaj at Sakaj's parents' home,[59] before moving to their own apartment a year later (9/5/12 Sakaj Tr. at 11).  Thereafter, they moved once more to another apartment where they have lived for more than three years. (9/5/12 Sakaj at 11-12; 2/17/12 A.D. Tr. at 8-9).  In their

---

[58]See note 46 supra.

[59]Sakaj's parents have been here since 2000 under political aslyum status.  (9/5/12 Sakaj Tr. at 52-55; see also 9/6/12 Sakaj Tr. at 50; Demaj Depo. at 128).

apartment in Simsbury, where they live with Sakaj, there are two bedrooms, a kitchen, a living room, and a bathroom.  (9/5/12 Sakaj Tr. at 12; 2/17/12 A.D. Tr. at 8-9).[60]  Although they have moved twice in the last five years, the fact that they have lived in the same town for the duration of their time in the United States weighs in favor of a finding that they are well-settled in their new environment, particularly in light of their ages.  See Matovski, 2007 WL 2600862, at *14 (two years in same home); Lozano, 809 F. Supp. 2d at 234 (well-settled five year old after sixteen months in same location); Silvestri v. Olivia, 403 F. Supp. 2d 378, 382, 388 (D.N.J. 2005)(well-settled after one and a half years for children ages nine, twelve and fourteen); Zucker, 2 F. Supp. 2d at 141 (well-settled four year old after fifteen months at same residence); In re Robinson, 983 F. Supp. 1339, 1345-46 (D. Colo. 1997)(children ages ten and six, well-settled after twenty-two months in new home).  Moreover, "[c]ourts that have found that a child was not settled have tended to do so in cases where, unlike here, the child has moved frequently and therefore [has] not had a stable living situation." Lozano, 809 F. Supp. 2d at 233 (multiple citations omitted); see also Filipczak, 838 F. Supp. 2d at 182 (children lived in multiple cities and attended multiple schools); Koc, 181 F. Supp. 2d at 153-54 (six year old in United States for two and one half years but who had lived at three different locations, attended three different schools, had only been exposed to a "limited group of friends and relatives[,]" and did not attend extracurricular activities or attend religious services regularly, was not well-settled)(citation omitted).

---

[60]A.D. described her life in Italy as life in a small, "very beautiful[]" village.  (2/17/12 A.D. Tr. at 30-31).  The family lived in an apartment with a balcony that looked over "really pretty[]" land.  (Id. at 31).  A.D. remembers their next door neighbor from Italy, but while she has seen pictures of her, she has not spoken to her since leaving Italy. ( Id. at 32, 78-79).  When she was young, she initially shared a bedroom with her parents and K.D., and when D.D. was born, K.D. and A.D. moved into their own room (id. at 32), just as they share a room in their apartment in the United States.  (Id. at 8-9).

<u>b. FAMILY AND FRIENDS IN THE NEW AREA</u>

The children see their maternal grandparents every day as they take the school bus to their grandparents' home after school.  (9/5/12 Sakaj Tr. at 39, 55).  Additionally, on Sundays, A.D. goes with her mother to her job so that A.D. can then go to her tennis lessons, and her siblings go to their grandmother's house.  (2/17/12 A.D. Tr. at 11).  In addition to Sakaj's parents, Sakaj's brother and sister-in-law, and Sakaj's sister, brother-in-law and their children (who are fifteen and thirteen and a half), all live nearby and are American citizens.  (9/5/12 Sakaj Tr. at 55-57; 2/17/12 A.D. Tr. at 9).

Conversely, when she lived in Italy, Demaj's sister, brother-in-law and their children lived near A.D.'s family.  (2/17/12 A.D. Tr. at 33). A.D.'s paternal grandparents lived in Albania when A.D. lived in Italy, and she traveled to Albania to visit them; she communicates with them now by telephone and Skype.  (2/17/12 A.D. Tr. at 34). Currently, her paternal grandparents split their time between Italy, living with Demaj, and Albania.  (Demaj Depo. at 10, 93-94).   According to Sakaj, the children did not see much of their paternal grandparents, only when they stayed with the family in Italy "for like a month or so." (9/6/12 Sakaj Tr. at 134, 135, 151-52).  Of  Demaj's three sisters, two live with him in his residence in Italy, and the third "lives partially in Italy and partially in Albania."  (Demaj Depo. at 9-10; <u>see also</u> 2/17/12 A.D. Tr. at 72-73 (A.D. testified that her Aunt Mirella lives in Italy now)).  A.D. testified that Demaj's sister Mirella acted more as a friend to A.D., and people comment that A.D. resembles her in appearance; however, A.D. testified that her aunt "wasn't like anyone [A.D.] could always say stuff to[,]" because she "wasn't really an open person[.]" (2/17/12 A.D. Tr. at 73-74).

According to A.D., her father told her mother that whenever he communicates

through Skype with the children, Mirella is next to her father, just out of the view of the video camera, so that A.D. has not seen her, but she sees A.D.; at her deposition, Mirella Demaj acknowledged that this was true.  (Id. at 75; see Exh. 105, M. Demaj Depo. at 43).[61] Sometimes, Demaj's parents are also present during the video calls.  (M. Demaj Depo. at 44).  Sakaj testified that the Demaj family members, other than Demaj himself, do not call the children. (9/5/12 Sakaj Tr. at 104).  Similarly, Mirella Demaj testified that she does not contact the children any more, and even before Sakaj left Italy, she and Sakaj were not on good terms so Mirella would not see the children.  (M. Demaj Depo. at 29, 31, 44).

c. ATTENDANCE AT SCHOOL

As discussed in detail in Section II.C. supra, all of the children are performing well in school, just as they had in Italy.  (9/5/12 Sakaj Tr. at 31-38, 130-36; 3/27/12 Fink Tr. at 7-13, 35-36; Exhs. K-1, K-2, K-4, K-6 to K-11; Exhs. 9-13).  In letters dating back to November 2008, the children's teachers have described the children as well-adjusted, with many friends.  (Exh. K-4).  Specifically, Susan Gebhardt, a kindergarten enrichment teacher for D.D. in the 2008-2009 school year, "observed [D.D. to] adjust easily to the class room routine[,]" engage in "appropriate play with peers[,]" and was "eager to learn new things." (Exh. K-4, at 3).  A.D.'s 2008-2009 teacher noted that A.D. had numerous friends  (id. at 4), and similarly, in the 2008-2009 school year, K.D.'s teacher noted that K.D. "has made strong connections with all of her classmates and teachers."  (Id. at 5). A.D.'s 2008-2009 teacher "attest[ed] to the fantastic progress [A.D.] . . . demonstrated [that] year[,]" noting that A.D. made a two to three year gain in  English in the previous nine months.  (Id. at 4).  Similarly,

_____

[61]Mirella Demaj testified that she does so because she "miss[es] them all the time and very much," and hers is an "unconditional love[]" for the children.  (M. Demaj Depo. at 43).

in 2008-2009, K.D. was "meeting the benchmark goals in all academic areas," which, in her teacher's words, was "remarkable since she just began acquiring the English language about [nineteen] months ago."  (Id. at 5).  D.D.'s second grade teacher noted that he has "acclimated quickly to [the school] community[,]" he has many friends, and he was meeting second grade expectations. (Exh. K-4, at 12).[62]  Additionally, the results of the Connecticut Mastery Tests reveal that A.D. and K.D. are "advanced" or at "goal" for math, reading and writing; that D.D. is "advanced" in math, reaching and writing; and that A.D.'s scores reflect at or better than "goal" since March 2008, within the first year of arriving in the United States.  (See 9/5/12 Sakaj Tr. at 35-38, 134-35; Exh. K-10).[63]

In addition to their academics, the children are involved in many extracurricular activities.  A.D. plays tennis on Fridays and Sundays, and she has been enrolled in tennis lessons since September 2007, the first month they arrived in the United States.  (9/5/12 Sakaj Tr. at 40-41, 155; 2/17/12 A.D. Tr. at 11, 155; see Exh. L-2, at 1).  A.D. agreed that tennis is an "important activity" to her, that she is "very good" at the game, that she participates in competitions, and that she hopes to be a professional tennis player (or a lawyer) when she grows up.  (2/17/12 A.D. Tr. at 22).[64]  K.D. also takes tennis lessons.

---

[62]While Demaj appropriately noted that the children's attendance records reflect that they are chronically late to school (see Exhs. K-1, K-6, K-9; see also 9/5/12 Sakaj Tr. at 39; 3/27/12 Fink Tr. at 36-38), there is no evidence that their tardiness has impacted their academic advancement in any way.  (See Exh. K-4).   Sakaj explained that with permission of the Simsbury school system, the children attend a school that is "farther" from their apartment so that they can take a bus at school dismissal to their grandparents' house for after-school coverage. (9/5/12 Sakaj Tr. at 39).

[63]K.D. told Attorney Davis that she hopes to attend Yale University after she graduates high school, and Attorney Davis testified that she would be "happy" to write a letter of recommendation for her.  (9/7/12 Davis. Tr. at 16).

[64]All three children also took tennis lessons in Italy, with A.D. training four times a week at the "pre-competition level[,]" and the two younger children taking "tennis lessons for beginners[.]" (Exh. 14; see also 12/17/12 A.D. Tr. at 35-36, 38-39 (testifying that she practiced four to five hours a day, every day)).  By all accounts, A.D. was an accomplished tennis player in Italy.  (See Exh.

(9/5/12 Sakaj Tr. at 41; Exh. P at 7). At the time that A.D. testified, she was taking Chinese and was playing the violin in school. (2/17/12 A.D. Tr. at 14-15). She began taking violin lessons at school in the fourth grade, when she was nine. (2/17/12 A.D. Tr. at 79-80; Exh. P at 3, 10). Similarly, K.D. also played the violin in the 2011-2012 school year, that is, fourth grade. (Exh. K-11, at 3; Exh. P at 6). Additionally, A.D. "is an active member" of her school community. (Exh. K-4, at 10). Besides belonging to the school's orchestra, as of 2011, she was a member of the Drama Club, the Spanish Club, and the Special Chorus (id. & Exh. P at 3, 10), and in the 2011-2012 school year, she participated in the Leadership Academy through her school. (Exh. K-11, at 2).[65]  In the words of A.D.'s sixth grade teacher during the 2010-2011 academic year, A.D. "appears to have completely acclimated to American culture and seems to be extremely comfortable and happy each and every day . . . ." (Exh. K-4, at 11).

The children enjoy bowling, going out to the movie theater and for ice cream, and they are invited to birthday parties, Bat Mitzvah celebrations and sleep overs with their friends. (9/5/12 Sakaj Tr. at 50). A.D. testified that on the weekends, the children shop with their mother, play tennis, or go to the pool, but if they have nothing planned, they "stay home and clean." (2/17/12 A.D. Tr. at 10-11). At the time of her testimony taken in

---

37). A.D. testified that she excelled in tennis and came in second in the children's matches at the Lemon Bowl, an international competition, when she was seven or eight years old. (2/17/12 A.D. Tr. at 36-37, 75-77; see also Exh. 40 (extensive photographs of A.D. with her trophy and other winners at this tournament)). As Carlo Polidari, one of A.D.'s tennis coaches in Italy, explained, the Lemon Bowel is an international tennis tournament, with as many as 1,500 athletes, primarily from Europe. (Exh. 109, Deposition of Carlo Polidari, taken on November 17, 2011, at 12-14; see also Exh. 36 (brief discussion of Lemon Bowl)).

[65]Attorney Davis testified that the three children did not appear to be "overscheduled like so many other children are," that they engage in a "few" extracurricular activities that they "enjoy[,]" and that "[t]he level of extracurricular activities does not appear to be causing them any stress." (9/7/12 Davis Tr. at 16-17).

Chambers, A.D. had just attended a Bat Mitzvah ceremony and party for a friend that she described as "really fun." (Id. at 80-81).   The children have play dates with their school friends, and they have Albanian friends in their apartment building. (9/5/12 Sakaj Tr. at 51-52).  The foregoing is more than ample evidence of the meaningful relationships the children have formed  here in the United States.  Conversely, A.D. does not talk, write, or video chat with any of the friends or the tennis coaches with whom she spent a lot of time with in Italy, and she is not "friends" with any of them on Facebook.  (2/17/12 A.D. Tr. at 78).

When the children arrived in the United States in 2007, A.D. and K.D. were fluent both in Albanian and Italian, but D.D., who was only three and a half, primarily spoke Albanian as that is the language spoken amongst family members. (9/5/12 Sakaj Tr. at  58-59; 3/27/12 Fink Tr. at 7).  Fink testified that within two years, A.D. and K.D. "had learned English very well," and they were "very comfortable with the teachers and with their classmates." (3/27/12 Fink Tr. at 12; see id. at 27).  As discussed above, all of the children speak English fluently, "as though they're natives[,]" ( id. at 7), and as  A.D. testified, she went from knowing only "the basics[]" of English when she first arrived to the United States five years ago (2/17/12 A.D. Tr. at 19), to thinking in English now. (Id. at 21).  In addition to English, the children speak Albanian, and when they speak to Demaj on Skype, they speak in Albanian but he mixes his speech with Albanian and Italian.  (9/5/12 Sakaj Tr. at 57-58). At home, Sakaj speaks to the children in Albanian, and the children usually answer in English. (2/17/12 A.D. Tr. at 19-20).  A.D.'s maternal grandparents speak to the children in Albanian as well, and her uncle "goof[s] off" with A.D., speaking in English, while A.D.'s aunt will speak in both English and Albanian.  (Id. at 20).  A.D. speaks to her father in Albanian because "[she] forgot Italian."  (Id.).   A.D. testified she realized that she no longer

remembers any Italian when her mother called an old friend in Italy and A.D. tried to speak to her, but A.D. "forgot . . some of the easiest words[ ]" which "shocked" her.  (Id. at 20-21).  According to Sakaj, the children can still understand Italian but they "cannot respond back[,]" and  Sakaj has played movies and DVD's for the children in Italian "very often[]" so that they would remain familiar with Italian.  (9/5/12 Sakaj Tr. at 58, 132-33).  As Sakaj explained: "I would love them to understand and to speak Italian better because they were born there and to know one more language doesn't hurt."  (Id. at 58).

A.D. testified that on Sundays, they use Skype with their father in Italy.  (2/17/12 A.D. Tr. at 11, 54-55; see also 9/5/12 Sakaj Tr. at 57, 163).  However, as Demaj acknowledged, their communication is not consistent as it "depends on a number of factors, on the time zone, whether [Sakaj] picks up the phone, [and] on [Demaj's] shifts, because [he] work[s] in shifts." (Demaj Depo. at 115).  Demaj estimated that they "may" speak "once, three times, maybe twice[]" a month. (Id.).[66]

_____

[66]A.D. clarified that her father does not call every weekend, but when he does, they talk about the gifts that he has sent them, like a laptop or iPad, or they talk about tennis. (2/17/12 A.D. Tr. at 55).  A.D. testified that sometimes she looks forward to talking to her dad, and sometimes she does not, because "[h]e screams. . . .  He says it like as a joke." (Id.).  Attorney Davis testified that A.D. "indicated . . . that she experienced him as pretty critical, and it just wasn't any fun to talk to him." (Davis Testimony, taken on September 6, 2012 ["9/6/12 Davis Tr."] at 178).  It was not something that A.D. "really felt like she wanted to make an effort to do, that she was not experiencing a connection to him." (Id.).  Similarly, K.D. reported to Attorney Davis that Demaj's comments to K.D. are "critical." (Id.).  When Demaj speaks to the children on Skype, he sometimes insults them, telling them they are fat, or are "losers" because they live with their mother now. (9/6/12 Sakaj Tr. at 126).  Attorney Davis testified that there is "nothing wrong with [K.D.'s] weight[,]" and that K.D. has "self-esteem" issues because unlike her mother and older sister, she is "not slim" but "a little more solid" like her father; she also agreed that none of these self-esteem issues had surfaced while K.D. was still living in Italy. (9/7/12 Davis Tr. at 56-57, 70-72).  Consistent with Sakaj's testimony, when shown a photograph of K.D. at his deposition, Demaj remarked, "[s]he's overweight." (Demaj Depo. at 124).  But see Exh. J, at 39 (K.D.'s pediatrician suggested that K.D. "[n]eed[s] to limit snacks and extra calories" to avoid being "[o]verweight.").

There was a period in late April when Demaj could not communicate with the children via Skype because Sakaj's computer was not working for a month. (9/5/12 Sakaj Tr. at 164-66 & Exhs. 86-88).  Sakaj also testified that sometimes Demaj can be "very late, like half an hour[,]" in

The evidence of the children's consistent academic performance, which includes glowing comments from their teachers that would make any parent proud, along with their extensive involvement in extracurricular activities from the time they arrived in the United States, is both substantial and persuasive.

### d.  RELIGIOUS INVOLVEMENT

Sakaj testified that when living in Italy, Demaj "discouraged" her attendance at church, but since October 2008, a year after she arrived in the United States, and for the past four and a half years, Sakaj and her children have attended first St. Anne's in Avon, Connecticut, and then St. Catherine's in Simsbury, the latter of which is closer to where Sakaj and her children now live.  (9/5/12 Sakaj Tr. at 42-43, 44-45, 47-48, 137-38, 141; Exh. L-1, at 1-8; Exh. L-1, at 9, ¶¶ 1, 3; Exh. L-2, at 2).[67] Sakaj and the children attend mass on Sundays together, and Sakaj attends mass during the week as well.  (9/5/12 Sakaj Tr. at 49, 50).

Sakaj and the children have all been baptized in the Catholic Church since arriving in the United States, and A.D., K.D. and D.D., who attend catechism classes on Sundays or during the school week, also received the sacraments of baptism, communion, and reconciliation in 2009 and 2011.  (9/5/12 Sakaj Tr. at 48-50; 2/17/12 Tr. at 11; Exh. K-11,

---

placing his calls, and sometimes "he doesn't call at all."  (9/6/12 Sakaj Tr. at 126-27).

[67]Sakaj acknowledged that she and Demaj had asked family friends, Paolo Perticaroli and his wife Mara Balladini, to be the godparents of their three children, but that the baptism never actually occurred; at his deposition, Perticaroli agreed that Demaj had made the same request, but that the and his wife were unable to do so because they already were the godparents for the children of Demaj's sister Eleonora.  (9/5/12 Sakaj Tr. at 43-44; Deposition of Paolo Perticaroli, taken November 19, 2011, at 15, 27-29; Exh. 25, ¶ 10).

According to Sakaj, she did not start to attend church until October 2008 because she could not drive and she did not speak English.  (9/6/12 Sakaj Tr. at 127).

at 5; Exh. L-1, at 1-8).[68]

### e. MOTHER'S EMPLOYMENT

Sakaj has been employed in her brother's restaurant  -- Tower View Pizza -- since 2007.  (9/5/12 Sakaj Tr. at 80-81).  Sakaj earns approximately $162 a week, and her family and family members "help [her] with other stuff."  (Id. at 156).   Her father helps her with her rent "[a]nytime [she] need[s] help[,]" which is "a lot[]" (id. at 188-89), and her brother pays her cell phone bill.  (9/6/12 Sakaj Tr. at 112). The help she receives from her family does not differ greatly from that which she received when she was in Italy with Demaj, as Demaj "always" asked Sakaj and the children to seek financial assistance from Sakaj's parents if the children needed clothes or "other stuff[.]"  (Id. at 131).  Her parents sent money "[a]ll the time[.]" (Id. at 132).   Since arriving in the United States, Sakaj paid for the children's private tennis lessons and other activities with child support money from Demaj,[69] Paula Fink "gifted some money to the kids[]" for the younger two children's tennis lessons, and at one point, A.D. received a scholarship for her tennis program.  (9/5/12 Sakaj Tr. at 160; see 9/6/12 Sakaj Tr. at 111, 160).

Sakaj has a law degree from Albania, and would like to work as a paralegal in the

---

[68]At the end of her religious education program for the 2011-2012 year, A.D. was presented with the Outstanding Christian Character Award.  (Exh. K-11, at 4).

She testified that they attended church in Italy for "like a year[]" with her school, but she never attended religious services with her family.  (2/17/12 A.D. Tr. at 33).

[69]A.D. testified that their father sends them checks, and at the time that her testimony was taken, they had just received such a check, without which they "struggled for the whole month." (2/17/12 A.D. Tr. at 12-13; see 9/6/12 Sakaj Tr. at 111 (Demaj pays child support in the amount of $289/week); 9/5/12 Sakaj Tr. at 101 (Demaj is not regular in payments, often two-and-one-half weeks behind in payments)).  According to A.D., because of Demaj's delay, they could not buy all of the food they would have wanted when purchasing school lunch.  (2/17/12 A.D. Tr. at 13).  A.D. testified that they had to borrow money from her grandparents, and Sakaj would pay them back when she received her check from Demaj.  (Id. at 12-13).

United States.  (9/5/12 Sakaj Tr. at 81, 207; 9/6/12 Sakaj Tr. at 65).  Sakaj concedes that

it was not legal for her to be working before she received her U-Visa, but she worked

because "I had no choice.  I had to provide for my kids."  (Id.).[70]  Additionally, Sakaj has

taken English as a Second Language classes and a course in Composition at Tunxis

Community College, and at the time of time, was enrolled in a U.S. History course.  (Id. at

82, 160-61).  Her father has given her money for some of her courses.  (Id. at 161).

     As Judge Castel recognized in Matovski:

> In Silvestri v. Olivia, [403 F. Supp. 2d 3 at 388], the Court denied a
> petition of the basis of the now-settled exception because the three children
> had lived in the same town for two-and-a-half years, had moved only once,
> and attended one school where they were succeeding academically and had
> many friends. . . . In that case, the petition was denied despite the fact that
> the children did not have relatives other than their mother in the United
> States. Id.  Similarly, in Arboleda v. Arenas, the Court found children to be
> settled in New York because they had lived in the New York area for over
> [thirty] months, performed well in school, had many friends, their mother had
> stable employment, and the children had relatives in the U.S.  311 F. Supp.
> 2d at 343.  By contrast, in [Koc], the Court determined that the child was not
> settled because, although she had lived in the U.S. for two-and-a-half years,
> she had moved three times, changed schools three times, did not socialize
> with other children, did not participate in extracurricular activities and had an
> uncertain immigration status.  Id. at 153-54.

2007 WL 2600862, at *13.  Judge Castel then went on to conclude that the children in that

case, who were living in a stable environment with consistent schooling and extracurricular

activities, and participation in Albanian dancing at the Albanian Catholic Church, along with

---

[70]Additionally, she has conceded that she drove with an international Albanian driver's
license in 2008, 2009, and 2010 (id. at 85-86), for which illegal driving Sakaj received a traffic
ticket on April 24, 2008.  (9/5/12 Sakaj Tr. at 87, 92-95; Exh. 77 (10/11/08 Simsbury Police
Department Case/Incident Report)).  During the traffic stop, Sakaj lied to the officer, telling him
that she had not been in the United States "very long."  (Id. at 93; 9/6/12 Sakaj Tr. at 90-91).
Sakaj explained that she was "moving fast to go back to [her] father[]" who was in the hospital, so
that she "wasn't thinking at all."  (9/6/12 Sakaj Tr. at 91).

     She also conceded that she has not paid State or Federal taxes or filed tax returns since
arriving in this country. (9/5/12 Sakaj Tr. at 82, 155).

substantial involvement with their extended family, including cousins, aunts, uncles and grandparents, were "now settled" in their new environment.  Id. at *14.  This conclusion was reached despite that fact that the mother was not consistently employed, as she was financially supported by the grandparents, and thus the "overall financial stability of the family [was] reasonably assured."  Id.

This case is remarkably similar to Matovski in that the children, who have been in the United States for five and a half years now, are living in a stable environment in the same town since they arrived, and in the same apartment for the past three and a half years.  The children have received consistent schooling. They have made school friends in addition to the many friends they have in their apartment complex.  The children are actively involved in extracurricular activities and attend church regularly, having received three sacraments in recent years.  Additionally, the children have a strong support network with extended family, including their maternal grandparents, aunts, uncles and cousins, as well as friends.  Bearing in mind that the children's lives "do not have to be perfect for [them] to be settled[,]" Lozano, 809 F. Supp. 2d at 233, the lives they are living in the United States are remarkably stable.  Although at this time Sakaj's employment does not allow her to be self sufficient, she is working towards educational advancement and with the consistent financial assistance from her parents and brother, the financial stability of the family is "reasonably assured." Matovski, 2007 WL 2600862, at *14; Silvestri, 403 F. Supp. 2d at 388 (three children who lived in same town, moved only once, attended one school, were succeeding academically, and had many friends, were well-settled).

<u>f. IMMIGRATION STATUS</u>

As the Second Circuit held five months ago:

> The importance of a child's immigration status will inevitably vary for innumerable reasons, including: the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits.

Lozano, 697 F.3d at 57. When deciding whether a child is well-settled, courts "must simultaneously balance many factors which, . . . may not support the same determination." Id. (footnote omitted). The court must consider the immigration status both independently and in relation to the other factors, before reaching its conclusion. Id. at 58.

As previously discussed in Section II.D.1. supra, Sakaj and the children applied for and were granted nonimmigrant status in July 2011. An individual granted U Nonimmigrant status may, after three continuous years of physical presence in the United States, apply for a green card. (See Exh. D). Additionally, this change in immigration status has afforded the children access to medical insurance through the Connecticut Husky program, through which the children's regular medical and dental care is covered. (See 9/5/12 Sakaj Tr. 73-75, 76, 79;Exh. M; see also 9/5/17 Sakaj Tr. at 65-66 (from September 2007 to 2011, Sakaj paid cash for the children's medical care)). Sakaj received her Connecticut Driver's license on November 12, 2011. (Exh. N). Sakaj conceded on cross-examination that she would not have been able to obtain these two cards without the U-Visa. (9/5/12 Sakaj Tr. at 190-91).

In the bulk of cases in which immigration status is considered, it is done so after an assessment of the foregoing factors, and it is considered as only one element among many pointing either in favor of a finding of significant ties to the United States, or in finding a lack of significant ties to the United States. (See February 2012 Ruling, 2012 WL 476168, at *4, citing In re Sasson, 327 F. Supp. 2d 489, 499-501 & n. 15 (D.N.J. 2004)(finding of well-settled when child "well adjusted[,]" has continuous schooling, participates in extra-curricular

activities, speaks English, has extended family close by, parent is holder of a O-1 artist visa and intends to apply for permanent residency); In re Ahumada Cabrera, 323 F. Supp. 2d at 1314 (finding of not settled when moved five times in two and one-half years, no other family in the United States; court noted that "any stability . . . is significantly undermined by Respondent's uncertain immigration status" which status also affects long-term employment prospects); Koc, 181 F. Supp. 2d at 152-55 (child not settled because although the child lived in the U.S. for two and a half years, he moved three times, attended three different schools, did not socialize with others, did not participate in extracurricular activities, and there was uncertain immigration status)(emphasis in original)).  See also Alonzo v. Claudino, No. 1:06 CV 00800, 2007 WL 475340, at *5-6 (M.D.N.C. Feb. 9, 2007)(no steps taken to acquire legal status in the United States, no family ties to the United States; court concludes child "cannot be considered 'settled' . . . considering her illegal status and the illegal status of her mother.").  In this case, given the children's current immigration status, which is relevant to this Court's overall consideration of whether the children are well-settled, there is nothing to suggest, neither at this moment, nor in the near future, that their immigration status is "likely to upset the stability" of their lives in Connecticut.  See Lozano, 697 F.3d at 58 (emphasis in original)(internal quotations & citations omitted).

After considering the foregoing factors, and the totality of the circumstances as presented to the Court, the children's lives "reflect stability in [their] family, educational, social and  most importantly, home life." Lozano, 809 F. Supp. 2d at 233.  As Attorney Davis described them, they are "healthy, happy, active, normal children[]" who are happy where they are living now.  (9/7/12 Davis Tr. at 19, 24).  Moreover, this is not a case wherein the well-settled exception creates a "perverse incentive[ ] by rewarding Respondent" for delays

during which the children have become well-settled to their new environment.  <u>Filipczak</u>, 838 F. Supp. 2d at 183 (allowing the well-settled exception would reward Respondent who concealed the children for over a year after arriving in the United States, and as soon as Petitioner located them, he commenced the action one year and twenty-five days after the children were removed to the United States).  For the reasons discussed in Section II.D.1. <u>supra</u>, Respondent and Petitioner both bear responsibility for three years of delay in this case.

<u>E. AGE AND MATURITY DEFENSE</u>

The "age and maturity" defense, or the "mature child exception" provides that a court "may . . . refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [his or her] views."  Hague Convention, Art. 13.  Respondent bears the burden of proving the applicability of this defense by a preponderance of the evidence.  <u>See</u> 42 U.S.C. § 11603(e)(2)(B).

"'Whether a child is mature enough to have [his or her] views considered is a factual finding' that a district court must make in light of the specific circumstances of each case[,]" <u>Hamidas v. Hamidas</u>, 720 F. Supp. 2d 183, 204 (E.D.N.Y.)(citation omitted), <u>aff'd</u>, 401 Fed. Appx. 567 (2d Cir. 2010), and "[g]iven the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate." <u>Hamidas</u>, 720 F. Supp. 2d at 204 (internal quotations & multiple citations omitted).  Neither the Hague Convention, nor the Second Circuit, has set a minimum age at which a child may be deemed sufficiently mature for a court to consider his or her objection.  <u>See Blondin IV</u>, 238 F.3d at 166-68 (declining to conclude that an eight-year old is too young to be

considered "mature" under this defense as to do so "would read into the Convention an age limit that its own framers were unwilling to articulate as a general rule.")(citation omitted). "Simply put, there are no established objective criteria or tests for assessing 'maturity' in the context of the mature child exception, although the Second Circuit has observed as a general matter that the standard should be a relatively demanding one." Hamidas, 720 F. Supp. 2d at 205 (internal citation omitted); see Blondin IV, 238 F.3d at 166-68.  The "child's maturity is a question for the district court, to be determined upon specific facts of each case[,]" and the fact that a child objects to return "is not alone determinative." Laguna v. Avila, No. 07-CV-5136 (ENV), 2008 WL 1986253, at *9 (E.D.N.Y. May 7, 2008).  "[I]t bears emphasis that the Convention merely calls for the court to 'take account of' a mature child's objection to return, not to accede to it automatically." Hamidas, 720 F. Supp. 2d at 204.  A lengthy wrongful retention, as in this case, "could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home." Id. (internal quotations & citation omitted).  The court "always retains discretion to order repatriation notwithstanding the applicability of any Hague Convention exception[,]" which discretion is "particularly important with respect to the mature child exception because of the potential for undue influence by the person who allegedly wrongfully retained the child." Id. (citations & internal quotations omitted).

In this case, by agreement of both parties, A.D. was questioned in Chambers by the guardian ad litem, in the presence of counsel only.  (Dkt. #57).  A.D. testified that she met Attorney Davis three times before the day she testified.  (Id. at 4-7).  The questions posed by Attorney Davis were stipulated to by all counsel, with vocabulary and sentence syntax that were appropriate for a preteen, and were carefully designed by Attorney Davis "to allow [the]

Court and counsel to understand who she was at that point in time, given that she's still a child[,]" and "to show [the] Court that this is what she's able to do, this is what she's able to report, this is how she sees her life, rightly or wrongful[ly], accurately or not, this is how she sees her life, and both historically and prospectively."  (Davis Testimony taken on September 6, 2012 ["9/6/12 Davis Tr."] at 9-10, 27).   Prior to her testimony, Attorney Davis spent time with A.D., giving her basic guidelines about what was likely to transpire during the proceedings, and A.D. "managed to do all of the things that I asked of her."  (Id. at 13-14).   During the course of her testimony, Attorney Davis confirmed with A.D., for whom English is not her first language, that if she did not understand any of the words that Attorney Davis was saying, A.D. would have to tell her, which A.D. understood.  (2/17/12 A.D. Tr. at 22).[71]

A.D., who had just turned thirteen at the time of her testimony, presented as strikingly mature for her age.  She understood the significance of her testimony as she testified that she was not nervous because she thought that what she was saying "[was] pretty important, because it's going to affect [her] life."  (2/17/12 A.D. Tr. at 23). Additionally, she understood the difference between telling the truth and telling a lie (id. at 26), and there was absolutely no evidence that she was coached in her responses.  When asked what her mother told her about A.D.'s day in court, A.D. testified that Sakaj informed A.D. that she would be testifying and she told her that it was "important[]".  (Id. at 23-24).[72]

---

[71]Attorney Davis also spoke with A.D. twice after February 17, 2012, and A.D. made no comments to Attorney Davis that would undermine the validity of her prior testimony and cause Attorney Davis to have any concerns.  (9/6/12 Davis Tr. at 14).

[72]Attorney Davis testified that A.D. did not indicate that her mother or her father gave her any instructions as to what to say, either to Davis in their meetings, or in Court.  (9/6/12 Davis Tr. at 170).

She answered all of the questions posed to her in a poised, direct and thoughtful manner. She spoke extensively of her memories of Italy (see, e.g., id. at 30-40, 45-47, 72-74),[73] and thus she was able to express a preference on where she wished to live based on a reasonable comparison of her life in Italy and her life in the United States. When asked by the Court as to her preference of where she would rather live, A.D. testified: "Well, I would rather live in the U.S., because I really like it here.  I have friends and school isn't bad.  But Italy is a really beautiful vacation spot.  So, we'll have to go there for vacation, but I would much rather live here."  (Id. at 83).  When asked if she wanted to go back to Italy, A.D. testified that she did not "really want to go there, because the[re] were bad moments[,] [a]nd [she does not] want to get back to all [of her] tennis."  (Id. at 58).  However, according to A.D., she would like to go to Italy for a vacation because it was "really beautiful."  (Id. at 58-59).[74]

The Court also heard the testimony of the guardian ad litem, Attorney Davis, who testified as to A.D.'s ability to testify in this case. (See 9/6/12 Davis Tr. at 156-80; 9/7/12 Davis Tr. 7-72; see Exh. U).[75] Attorney Davis met with the children between six and ten times, with most interactions with A.D., then with K.D., and the least of which with D.D., the

---

[73]According to Attorney Davis, A.D. was clear in her memories of Italy, while K.D. was "a little less clear, and D.D. [was] not clear at all about Italy."  (9/6/12 Davis Tr. at 174).

[74]When asked if she would be afraid to return to Italy, A.D. testified, "[t]o Italy, no; my dad, yes[,]" because of "all [of] the tennis, all the slapping[,] [and] [m]y mom wouldn't be there to help me."  (Id. at 59).

[75]During the trial, this Magistrate Judge ruled that Attorney Davis was not testifying as an expert, but "her stature as a court-appointed guardian ad litem and as [an] attorney who specializes in juvenile matters elevates her to some degree above an ordinary lay witness." (9/6/12 Davis Tr. at 153-56, 169; see also id. at 159-62, 169 (regarding Attorney Davis' expertise in representing children in family matters)).  Attorney Davis testified emphatically that she was not working for either parent in this matter.  (Id. at 162).  Attorney Davis devoted substantial time to this litigation (id. at 163-69, 170-79; 9/7/12 Davis Tr. at 7-72), and her contributions were invaluable to the Court.

youngest child.  (9/6/12 Davis Tr. at 157).[76]  She first met with them in the fall of 2010, so that she had been involved with the family for more than two years at the time of her testimony.  (Id. at 164).  When she first met A.D., Attorney Davis found her "very well-spoken[.]" (Id.).[77]  She felt it was appropriate for A.D. to testify in this matter given her age, her understanding of the English language, "her emotional reaction to talking about some of the difficult issues that we were going to talk about[,]" her "ability to work within this framework, her ability to understand what was being asked of her, her ability to be able to report accurately as her memory dictated, and her ability to handle emotionally what we were asking of her."  (9/7/12 Davis Tr. at 7-8).  As Attorney Davis observed, the children are happy living in the United States.  (9/7/12 Davis Tr. at 24).

Just as in Matovski, wherein a twelve year old child preferred to remain in the United States because she has more family and friends, and enjoys a more stable life here, A.D.'s response reflects a "mature understanding of her circumstances."  See Matovski, 2007 WL 2600862, at *14.[78]  Moreover, this Court is mindful that the mature child "exception must not be applied where the opinion of the child is the product of undue influence by either parent[,]" and this conclusion has been reached after careful consideration that A.D.'s opinion was not the subject of undue parental influence.  Id., citing de Silva v. Pitts, 481 F.3d

---

[76]On February 13, 2012, this Court granted Petitioner's Motion to Preclude Testimony of K.D. and D.D.'s preferences with regard to residency, to which Respondent did not object.  (See Dkts. ##82, 84, 86; see note 5 supra).

[77]According to Attorney Davis, the two girls "are more aware, they are more troubled[,]" whereas D.D. is "relatively untouched."  (Id. at 167).

[78]In a Case/Incident Report from the Simsbury Police, dated April 24, 2008, when A.D. was nine years old, the officer who was dispatched to Sakaj's home upon a report that the children were left alone, noted that A.D., in whose care the children were left, "seemed very mature for her age and obviously able to watch and or supervise the two younger children for short periods of time."  (Exh. 77 (4/24/08 Simsbury Police Department Case/Incident Report)).

1279, 1286-88 (10th Cir. 2007)(affirming district court decision that thirteen year old satisfied the objection defense when child stated that he had made friends in the United States, preferred his home, and thought the school was better here); Laguna, 2008 WL 1986253, at *10-11 (thirteen year old boy's honest opinions and wishes not the product of parents' influence buttressed by testimony that he likes school here, makes good grades, has a lot of friends, and that life here will provide him with better opportunities).

F. DISCRETION

A finding that the children are well-settled does not end the analysis as the Court retains the discretion to repatriate the children even if they are now settled in Connecticut, and even when a child, whom the Court finds mature, objects to her return.  Lozano, 809 F. Supp. 2d at 234.   As stated above, there is strong evidence that the children are well-settled in Connecticut, and have been since 2009 when the Petition was first filed.  This Court's decision to deny the Amended Petition is not a custody determination.  See Blondin II, 189 F.3d at 245 (the district court "has the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim.")(citation omitted); Lozano, 809 F. Supp. 2d at 234-35 (same).  Rather, this ruling is a decision that the custody determination should be made by a court in Connecticut, as opposed to one in Italy. Accordingly, the children should not be returned to Italy at this time and the custody arrangements of the children should be determined in Connecticut.[79]

----

[79]The Court acknowledges that this outcome may be unfair to Petitioner who lacks the immigration status and faces additional barriers to travel to the United States.  See Lozano, 809 F. Supp. 2d at 235, n. 21 (the court recognized that its decision is "unfair" to Petitioner who has been denied access to his child for more than two years and neither party appears to have the finances or immigration status to be able to travel easily for a custody hearing).  That said, however, the Convention provides for the well-settled defense under Article 12 and this Court has concluded that the defense has been amply met.

## III. CONCLUSION

For the reasons stated above, this Court concludes that as of September 2007, the children's habitual residence was Italy, but as of June 2008, the children's habitual residence had shifted to  Connecticut, so that Sakaj's retention of the children was not "wrongful" because she was not retaining them from what was then their habitual place of residence (see Section II.C.3 supra); alternatively, even if Italy remained as the children's habitual place of residence, Sakaj's "wrongful retention" of the children occurred in October 2007, at which point the children had been in Connecticut more than one year prior to when the petition was filed here (see Section II.C. supra), they are "well-settled" in their new environment (see Section II.D. supra), and A.D. has attained the age and maturity at which it is appropriate to take account of her views that she objects to being returned to Italy (see Section II.E. supra), so that the Article 12 and Article 13 defenses to wrongful removal have been established.   The Court further exercises its discretion not to return the children to Italy under the totality of all these circumstances.  (See Section II.F. supra).

Accordingly, it is ORDERED that Demaj's Petition for return of the children to Italy is **denied** and judgment to that effect shall enter forthwith.

Dated at New Haven, Connecticut, this 18th day of March, 2013.


 /s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge